**Richard R. WOODY; Pinesbrook Motors, Incorporated, Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellee.**

**No. 93–1331.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 30, 1993.

Decided Nov. 23, 1993.

Robert Cornelius Wood, III, Edmunds & Williams, P.C., Lynchburg, VA, argued (James O. Watts, IV, Henry M. Sackett, III, Edmunds & Williams, P.C., on the brief), for plaintiffs-appellants.

Joseph C. Kearfott, Hunton & Williams, Richmond, VA, argued (David F. Peters, Donald P. Boyle, Jr., Hunton & Williams, Richmond, VA, Edward C. Wolfe, General

Motors Corp., Detroit, MI, on the brief); for defendant-appellee.

Before RUSSELL, WILKINS, and LUTTIG, Circuit Judges.

## OPINION

LUTTIG, Circuit Judge:

The United States District Court for the Western District of Virginia granted appellee General Motors Corporation's motion for summary judgment on appellant Richard R. Woody's claims of breach of contract, violation of express and implied covenants of good faith dealing, tortious interference with contract, negligence, fraud, and conspiracy, arising out of General Motors' refusal to approve two proposals by Woody to sell his Buick dealership. We affirm the district court's disposition of Woody's tort and express bad faith dealing claims. We disagree, however, that summary judgment was warranted on Woody's breach of contract claim and therefore remand the case for trial on that cause of action.

### I.

Woody operated Pinesbrook Motors, Inc., in Lynchburg, Virginia, under a 1985 Dealer Agreement with General Motors Corporation (GM). In February 1990, Woody informed GM that he wished to retire. Thereafter, he sought to sell Pinesbrook to a willing purchaser. On May 22, 1990, Woody entered into a buy-sell agreement with Glen Wood of Royal Olds in Lynchburg, under which Wood would purchase Pinesbrook's assets and move the dealership to the Royal Olds location. The agreement, however, was expressly subject to GM's approval and, by the end of July 1990, GM had not approved the transaction. Since Woody's Dealer Agreement was to expire on October 31, 1990, he entered into a second buy-sell agreement, this time

with Charlie Obaugh of Obaugh Chevrolet in Lynchburg. Under this agreement, too, Pinesbrook's assets would be sold and the dealership relocated. The Obaugh Agreement was also conditioned on GM's approval, and, on October 22, 1990, GM informed Woody that it was rejecting the Obaugh proposal. Woody was unable to find another buyer before his Dealer Agreement expired.

Following expiration of his Dealer Agreement, Woody filed the present action against GM, alleging that it had breached the Dealer Agreement by arbitrarily refusing to agree to his proposals to sell Pinesbrook to Wood and Obaugh. He also alleged violations of express and implied covenants of good faith dealing, tortious interference with contract, negligence, fraud, and conspiracy. The district court dismissed Woody's tort claims because they flowed from the alleged breach of contract,[1] and granted GM's motion for summary judgment, holding that the Dealer Agreement unambiguously conferred on GM "unfettered discretion to grant or decline approval [of Woody's proposals] for its own reasons." *Woody v. General Motors Corp.,* Civil Action No. 92–0016–L, slip op. at 10 (W.D.Va. filed Feb. 26, 1993). This appeal followed.

### II.

■ Woody argued before the district court that GM's conduct violated Article 3 and Paragraph FOURTH of the Dealer Agreement, which, he contended, require GM not to refuse arbitrarily to agree to dealer proposals to sell principal assets. The district court rejected this argument, accepting instead GM's contention that because a relocation of the dealership was entailed in Woody's proposals, GM's actions were unambiguously governed exclusively by Article 2 of the Dealer Agreement,[2] which Woody con-

---

1. We find no merit in Woody's argument that the district court erred in dismissing these claims, or in his contention that GM violated an express covenant of good faith dealing.

We do not address whether a covenant of good faith between GM and Woody impliedly exists by virtue of Michigan law, however, because we conclude below that it is a jury question whether GM had full discretion under the contract to

accept or reject Woody's proposals. The district court reached and determined this question, but only because it concluded that the contract unambiguously conferred upon GM total discretion over whether to accept Woody's proposals.

2. ARTICLE 2. DEALERSHIP OPERATIONS

    Article 2.2  Dealership Location and Premises
        2.2.1  Responsibility of Dealer

cedes does not itself bind GM not to act arbitrarily.

We disagree with the district court's conclusion that Article 2 is unambiguously the only provision in the Dealer Agreement applicable to Woody's proposals. We believe that Woody's interpretation of the Dealer Agreement, which renders Article 3 applicable to his proposals, is plausible, if not compelling, and, accordingly, that summary judgment for GM was inappropriate. *See Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726 (4th Cir.1979) ("Only an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.'") (quoting *American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir.1965)).

Two provisions of Article 3—Articles 3.3 and 3.1.1—can reasonably be read to require GM to review Woody's proposals under that article, and therefore under a non-arbitrariness standard. Both of Woody's proposals

> Dealer will conduct the Dealership Operations only from the location (herein called Dealership Location) approved for that purpose by General Motors and will not, either directly or indirectly, establish any place of business for the conduct of any of its Dealership Operations except at the Dealership Location.
> 2.2.2 Changes
> If Dealer desires to make any changes in the Dealership Location ... Dealer agrees to give General Motors prior written notice so General Motors can discuss the effect of the proposed change with Dealer. No change in Dealership Location ... will be made without the written approval of General Motors.
> J.A. at 226.

3. The article reads in relevant part as follows:
Article 3.3 Other Changes in Management and Ownership or Sale of Assets
In order for General Motors to effectively ... administer the authorized dealer system, Dealer agrees in Paragraph FOURTH to give General Motors prior written notice of any proposed change in its Dealer Operator or ownership or any proposed disposition of its principal assets. In turn, General Motors agrees to consider Dealer's proposal under the standards identified in Paragraph FOURTH and not to arbitrarily refuse to agree to such proposal. J.A. at 234.

4. FOURTH: Changes in Management and Ownership

contemplated, in addition to a relocation of the dealership, a disposition of the dealership's principal assets. *Compare Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873 (5th Cir.), *cert. denied*, 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989) (proposed relocation only). Article 3.3 states plainly that in return for the dealer's agreement in Paragraph FOURTH to notify GM in writing of "any" proposed principal asset disposition, "General Motors agrees to consider Dealer's proposal under the standards identified in Paragraph FOURTH."[3] Given that it would reasonably appear that one of the standards of Paragraph FOURTH is not to act arbitrarily,[4] this agreement could reasonably be understood as an undertaking by GM not to act arbitrarily in considering proposed dispositions of principal assets.[5] Even were this language not interpreted as an agreement to refrain from acting arbitrarily, GM seemingly agreed explicitly in the very next line of Article 3.3 "not to arbitrarily refuse to agree to such proposal." J.A. at 234. Thus, GM arguably agreed in at least

> If Dealer desires to ... sell its principal assets or change its ownership in a manner not covered under Article 3, Dealer will give General Motors prior written notice of the proposed change or sale. To enable General Motors to evaluate and respond to Dealer concerning any such proposed change or sale, Dealer agrees to provide, in the form requested and in a timely manner, all applications and information customarily requested by General Motors to evaluate the proposed change or sale. *General Motors will not arbitrarily refuse to agree to a proposal, change or sale submitted by Dealer and will consider all factors requested by Dealer.* General Motors will base its decision on whether the proposed change is likely to result in a successful dealership operation with acceptable management and ownership which will provide satisfactory sales, service and facilities for Buick customers at the approved location.
> *Id.* at 220 (emphasis added).

5. Article 3.3 could be understood essentially as a restatement of Paragraph FOURTH. *But see* discussion *infra* at 1111. So read, the article would be superfluous, but not susceptible of a reasonable interpretation contrary to GM's argument as to the meaning of Paragraph FOURTH. GM never mentions Article 3.3 at all, presumably because the article's language could be read to conflict with its argument as to the scope of Paragraph FOURTH. *See id.*

two places within Article 3.3 not to act arbitrarily in considering dealer proposals to dispose of principal assets, such as Woody's.

Even if Article 3.3 does not extend to Woody's proposals, it is reasonable to interpret Article 3.1.1 as covering them, and thereby requiring that GM not act arbitrarily. In that provision, after reaffirming its right to select successor and replacement dealers, and to approve its dealer operators, owners, *and the location of its dealership facilities,* GM agreed to perform "such responsibility as set forth in Paragraph FOURTH" by evaluating each candidate's qualifications and proposal for the conduct of dealership operations against the standards in the Dealer Agreement.[6] If the words "such responsibility" are understood to refer to the immediately preceding right to approve or reject proposals as to "replacement dealer[s]," "dealer operator[s]," "owners," and "location[s] of its dealership facilities," the entire phrase can be understood as an agreement by GM to approve or reject dealership owner, operator, and location proposals "as set forth in Paragraph FOURTH," *i.e., in the manner* set forth in Paragraph FOURTH. So understood, GM presumably would be bound not to act arbitrarily in passing upon proposals such as Woody's, which entail ownership changes and dealership relocations.[7]

The words "such responsibility" could also reasonably be read to refer to GM's "responsibility of continuing to administer the system and selecting the most suitable dealer candidate in each circumstance," the only responsibility designated as such in either Paragraph FOURTH or Article 3.1.1.[8] If the words were understood thus, GM would still be bound to an arbitrariness standard because it would have agreed to perform its responsibility either in the manner that it agreed to perform its Paragraph FOURTH responsibilities, *see infra,* or, as provided in Article 3.1.1, by evaluating each candidate and proposal "against the standards set forth in th[e] Agreement," J.A. at 232, both of which agreements would require it to act reasonably.

The words "such responsibility" even could reasonably be interpreted as referencing not the duty to approve or reject the specific kinds of proposals identified in the immediately preceding sentence but, rather, GM's responsibilities specified in Paragraph FOURTH. Under this construction as well, GM would be bound not to act arbitrarily when considering Woody's proposals, because, as GM ultimately conceded at argument, the Paragraph FOURTH "responsibilities" include the responsibility in the third sentence of that paragraph not to act arbitrarily on any proposed sale of principal assets.[9] GM's only response to these reason-

---

6. Article 3.1   Rights of General Motors

   3.1.1   Selection of Dealers
   General Motors has the responsibility of continuing to administer the system and selecting the most suitable dealer candidate in each circumstance.
   Accordingly, General Motors has the right to select each successor and replacement dealer and to approve its dealer operator and owners and the location of its dealership facilities. *General Motors shall perform such responsibility as set forth in Paragraph FOURTH on the basis of evaluating each candidate's qualifications and proposal for the conduct of dealership operations against the standards set forth in this Agreement.*
Id. at 232 (emphasis added).

7. That Article 3 can reasonably be read as extending to dealership relocations is further confirmed by the fact that Article 3.2 expressly contemplates dealership relocations by a new dealer. Article 3.2.3 provides that GM will not arbitrarily refuse to accept a successor operator proposal

under Article 3.2, provided *inter alia* that the proposed successor dealer and operator are willing and able to comply with terms of a new dealer agreement "at an approved location." Article 3.2.5 provides that GM may offer a new dealer agreement to a proposed successor dealer in the circumstance where GM "plans to have Dealer relocate its Dealership Operations." *Id.* at 233.

8. This reading is supported by Article 3.3's use of the word "responsibility" to refer unmistakably to GM's "responsibility to administer the authorized dealer system." *Id.* at 234.

9. GM initially took the position that the Paragraph FOURTH "responsibilities" referenced in Article 3.1.1 were those of acting upon dealer operator and owner changes, and sales of principal assets, at the same dealership location. When pressed, however, GM's counsel agreed that the reference was to the duties in the second and third sentences of the second paragraph of Paragraph FOURTH.

able interpretations of Article 3 is that Paragraph FOURTH is concerned solely with dealer operator and ownership changes, and asset dispositions *at the same location*, and therefore that the Article 3 language recited above must be read as limited to such changes at the same location.[10]  In support of its contention as to the meaning of Paragraph FOURTH, GM points to the final sentence of Paragraph FOURTH that "[GM] will base its decision on whether the proposed [dealer operator or ownership change, or disposition of assets] is likely to result in a successful dealership operation ... *at the approved location.*"  *Id.* at 220 (emphasis added).  Assuming that GM's is a plausible interpretation of Paragraph FOURTH, we are not prepared to conclude that it is the only reasonable interpretation of that paragraph.  Moreover, even were we to agree with GM as to its interpretation of this paragraph, we could not agree with its ultimate conclusion that it is entitled to judgment as a matter of law.

As to the scope of Paragraph FOURTH, first, nothing inherent in the phrase "the approved location" requires that it refer solely to the existing, preapproved locations.  And throughout the Dealer Agreement, the parties appear to have referred to the dealership location already approved by GM as the "Dealership Location," suggesting, if anything, that as used in Paragraph FOURTH the phrase "the approved location" was not

intended to have the same meaning as "Dealership Location".  In fact, within Article 3 itself, *see* Articles 3.2.2, 3.2.3, the parties distinguished between "Dealership Location" and "an approved location," clearly invoking the latter term so as to reference locations in addition to, if not other than, the then-existing Dealership Location.[11]  Second, the first sentence of Paragraph FOURTH could reasonably be read (and perhaps could be read only) as confirming that the paragraph extends to all dealer operator and ownership changes, and to all sales of principal assets, regardless of whether those changes will occur at the same location, *provided only that the changes are proposed to be effected "in a manner not covered under Article 3".*[12]  Third, Article 3.3 describes the dealer as having agreed in Paragraph FOURTH to apprise GM of "any" proposed change in dealer operator or ownership, or "any" proposed disposition of principal assets, not merely such changes at the original dealer location.  Fourth, if as GM contends, Paragraph FOURTH is confined to proposed changes at the same dealership location, then the inclusion in Article 3.1.1 of the requirement that GM perform "such responsibility as set forth in Paragraph FOURTH"—at least as that requirement is understood by GM—would appear to be superfluous, because its injunction is already set forth in the final two sentences, if not the final sentence alone, of Paragraph FOURTH.

10. For this reason, GM's counsel urged at argument that the phrase "such responsibility as set forth in Paragraph FOURTH" should be strictly read as if it said "such responsibility as *is* set forth in Paragraph FOURTH," rather than as if a comma appeared following the word "responsibility."

11. Use of the article "an" would not appear to be of any substantive significance.  Paragraph FIRST distinguishes even between *"the* location approved" and "Dealership Location":

   FIRST:  Rights Granted General Motors grants Dealer a non-exclusive right to:

     .      .      .      .      .

     (b) identify itself as an authorized Buick dealer *at the location approved by General Motors.*
   Dealer accepts the rights granted by General Motors and agrees to:
     (d) establish and maintain satisfactory Dealer Premises *at the Dealership Location.*
J.A. at 219 (emphasis added).

12. If the sentence is read in this manner, as it is written, then arguably GM must avoid acting arbitrarily on Woody's proposals, *even if GM is correct as to the meaning of both Article 2 and Article 3.*  For, as single proposals of asset sales *and* dealership relocations, Woody's proposals would not have sought changes "in a manner covered under Article 3," and therefore would be governed exclusively by Paragraph FOURTH.  It is understandable that GM would not have focused the court's attention on this language from Paragraph FOURTH; it is less clear why Woody would not have rested his argument at least in part on this language unless, of course, he believed that Paragraph FOURTH and Article 3 are mutually exclusive and, as a consequence, that he could not argue that his proposals were of a kind covered by Article 3 but were not to be carried out in one of the manners provided by that article.

However, even accepting GM's reading of the phrase "approved location," and thus its argument as to the scope of Paragraph FOURTH, it does not follow that GM is, unambiguously, relieved of the duty not to act arbitrarily. As noted, GM's argument depends upon reading the Article 3.1.1 phrase "such responsibility as set forth in Paragraph FOURTH" as though it read "such responsibility as *is* set forth in Paragraph FOURTH." *See supra* note 10. As is clear from the discussion above, however, there are at least two other plausible interpretations of that phrase that still would require that GM not act arbitrarily in accepting or rejecting proposals such as Woody's.

\* \* \* \* \* \*

The vexatious aspect of this case, which went unnoticed by the district court and which is understandably ignored by GM, is that Woody proposed single transactions entailing both a sale of principal assets and a dealership relocation. Accepting the parties' arguments at face value, they appear not to have contemplated such proposals. *But see, supra* at 9 and note 12. They anticipated either a dealer proposal to relocate his own dealership or a proposed sale of assets to a purchaser who would operate the dealership from the seller's current location. It should come as no surprise that a contract drawn in contemplation of separate proposals of sales and relocations would be ambiguous on the contractual obligations that obtain when considering a single proposal comprising both types of transactions. It would be surprising were it not. Such is to be expected especially where, as here, the underlying contract is frighteningly ambiguous even as it governs proposals that were within the express contemplation of the parties.

█ The judgment of the district court, insofar as it awarded summary judgment in favor of General Motors Corporation on Woody's breach of contract claim, is there-fore vacated, and the case is remanded for such further proceedings as are necessary.[13]

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

---

**13.** We also reject GM's argument that the Virginia Motor Vehicle Dealers Act, Va.Code Ann. § 46.2–1566 *et seq.*, privileges its conduct. In particular, GM cites § 46.2–1569(3), which provides that "[n]o franchise may be sold, assigned, or transferred unless ... the sale or transfer of the franchise and business will not involve, without the franchisor's consent, a relocation of the business." The plain meaning of this sentence is that sales involving relocations are illegal unless consented to by the franchisor. The statute does not even purport to regulate how an automobile manufacturer's consent is to be granted.