**Al CARNEY and Al Carney Chevrolet–Buick, Incorporated, Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellee.**

No. 93–3158.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1994.

Decided May 3, 1994.

Eric A. Frey, Mark D. Hassler, Lynn A. Francis (argued), Frey, Hunt, Hassler & Lorenz, Terre Haute, IN, for plaintiffs-appellants.

Richard C. Godfrey, Kirkland & Ellis, Chicago, IL (argued), Wendell R. Tucker, Baker & Daniels, Indianapolis, IN, for defendant-appellee.

Before POSNER, Chief Judge, ROVNER, Circuit Judge, and GILBERT, Chief District Judge.*

GILBERT, Chief District Judge.

This case is before us on appeal from the district court's grant of summary judgment in favor of the defendant in a breach of contract and fraud action. For the following reasons, we affirm the district court's decision.

## I. BACKGROUND

On December 4, 1987, General Motors ("GM") entered into an agreement with Al Carney Chevrolet Buick, Inc. ("Carney Chevrolet") to grant Carney Chevrolet the right to operate a general automobile dealership which sold GM products in Putnam County, Indiana.[1] At all times relevant herein, this dealership was owned and operated by Al Carney as the sole stockholder and chief executive.

The agreement between the parties was memorialized by two integrated agreements entitled "Dealer Sales and Service Agreements." There was one agreement for each GM division, Chevrolet and Buick. Two provisions in these agreements are relevant to this appeal. The first provision is that the Agreements gave Carney Chevrolet the "right to operate a Chevrolet franchise on Indianapolis Road in Greencastle, Indiana." And second, the Agreements contained a provision dealing with change of dealership location:

---

* The Honorable J. Phil Gilbert, Chief District Judge for the Southern District of Illinois, is sitting by designation.

1. This agreement was originally between GM and Carney–Nichols Chevrolet Buick, Inc. It was never formally amended to provide for the substitution of Carney Chevrolet for Carney–Nichols Chevrolet Buick, Inc. However, prior to 1989, Carney Chevrolet succeeded to the interests of Carney–Nichols Chevrolet Buick, Inc.

If Dealer desires to make changes in the Dealership Location or Dealership Premises or in the uses or purposes previously approved by General Motors for such Dealership premises, *Dealer agrees to give General Motors prior written notice* so General Motors can discuss the effect of the proposed change with Dealer. *No change in Dealership Location or in the use of Dealership Premises in Dealership Operations will be made without the written approval of General Motors.*

Any changes in the Dealership Location or Dealership premises or their use in Dealership operations agreed upon by Dealer and General Motors and changes made by General Motors in space guides shall be reflected in a new Dealership location and premises Addendum or a separate written agreement executed by Dealer and General Motors.

Agreements, Additional Provisions, § 2.2.2 (emphasis added).

In 1989, Carney Chevrolet was experiencing financial difficulty and therefore, retained an independent "financial consultant," Haikaz Stephan, to devise a strategy to restore the dealership to financial health. As a part of his services to Carney Chevrolet, Mr. Stephan prepared a report which contained a financial analysis of the dealership and a "business plan" which was designed to lure investors into investing in Carney Chevrolet. The report was addressed "TO WHOM IT MAY CONCERN" and contained a section concerning Carney Chevrolet's landlord problems.

I met with Mr. Carney's landlord, Jim Harris, on three separate occasions and was not able to reach an agreement. Jim Harris continued to demand a rent increase to $6,500 monthly from $3,500 monthly. During the last three months I met with Don Williams of Tucker Realty to discuss leasing the strip center located a few blocks from Mr. Carney's dealership. Tucker was not able to rent the center due to extreme legal complications concerning Hooks and previous stores that had filed Chapter 11 in bankruptcy court. As of three weeks, [sic] Tucker has agreed, however, to lease the vacant center to the dealer. Presently the landlord has a lawsuit against Al Carney for an eviction.

Appellant's App. at 134–5.

On July 18, 1989, Al Carney and Mr. Stephan met with Jim Chester, an account manager for GM, to advise Mr. Chester of the dealership's financial status. At this meeting a copy of the report was given to Mr. Chester. However, Mr. Stephan also told Mr. Chester that he planned to purchase another piece of property in Greencastle and lease it to Carney Chevrolet. This location was referred to as the "Murphy property."

In August or September 1989, John Crubaugh, a Chevrolet Motor Division Field Representative, visited Mr. Carney. The two of them, along with Mr. Stephan, visited the strip mall site and discussed its potential use as a dealership facility. A rough sketch of how the building would be converted to an automobile dealership was given to Mr. Crubaugh. On September 6, 1989, Mr. Carney wrote to GM stating that as of August 31, 1989, he had been evicted from his current location and that he had moved his dealership to his wife's Chrysler dealership temporarily. Also alluded to was the fact that Mr. Carney and Mr. Stephan were still, as of yet, unable to reach an agreement with the owners of the strip mall for the purpose of Carney Chevrolet moving to that location. The letter stated:

Mr. Stephan, whom you have already met in your office, is negotiating with Tucker Realty of Indianapolis to buy the 70,000 square foot strip center. The center is located south of my previous location and across from McDonald's, which is a very prestigious location in Greencastle. As of today, Tucker Realty has agreed to sell the property with a price agreeable to both parties. A detailed letter is being prepared by Tucker. Mr. Stephan has been negotiating for the last four months on leasing or buying the property from Tucker Realty, the owners. We will inform you of further developments.

Appellant's App. at 67.

On October 11, 1989, GM terminated the franchise, citing Carney Chevrolet's eviction from its approved location, its unauthorized

move to the Chrysler dealership, and the fact that Carney Chevrolet had not been open for business since August 31, 1989. GM stated that Carney Chevrolet had violated the initial Agreement between the parties by failing, for seven consecutive business days, to conduct sales and service operations during customary business hours. *See* Agreement, Additional Provisions, § 4.1.6(b).

On October 12, 1990, the plaintiffs filed this lawsuit against GM seeking $2 million in damages. After portions of discovery were completed, the defendant moved for summary judgment on all issues of the complaint other than plaintiff's claim for "certain monies" owed to the plaintiff by GM. The "certain monies" issue is not a part of this appeal. The district court, in a 12–page opinion, granted summary judgment to the defendant and entered a final judgment a year later when the remaining issue was decided. Notice of appeal was then timely filed.

## II. ANALYSIS

### A. Standard of Review

■ We review the district court's grant of summary judgment in favor of the defendant *de novo. Dickinson v. Indiana State Election Board,* 933 F.2d 497 (7th Cir.1991).

### B. Discussion

GM moved for summary judgment on two grounds: first, that Carney Chevrolet had failed to comply with the Agreement's clear requirement of prior written notice for any location change so that GM could not have wrongfully withheld consent and, second, that Mr. Carney, as an individual, is not a proper party to this suit. We will address each of these issues separately.

■ As to whether or not Al Carney is a proper plaintiff in this cause of action, we agree with the district court's determination that he is not. Mr. Carney asserts that he is not suing for breach of contract, but rather he is seeking relief for the "independent tortious conduct" of GM by alleging that GM

engaged in a "pattern of deceit" that "injured and damaged Carney." Carney's own argument is the fatal defect in his claim. Mr. Carney asserted below that GM "misrepresented facts and deceived him with regard to whether or not he could be permitted to operate a GM dealership in the Murphy building." But Mr. Carney does not have an individual right to "operate" a GM dealership in the Murphy building or anywhere else. This right belongs to Carney Chevrolet, and not to an individual corporate shareholder, even if he is the sole shareholder and chief executive. *Moore v. Moore,* 482 N.E.2d 1176, 1181 (Ind.Ct.App.1985); *see also Twohy v. First Nat. Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985) (holding that under general principles of United States corporate law, a stockholder of a corporation has no personal or individual right of action against third persons for damages that result indirectly to the stockholder because of an injury to the corporation). Therefore, this cause of action belongs to Carney Chevrolet and not Al Carney as an individual.

■ We also agree with the district court on the second issue—i.e., that proper prior written notice was not given to GM concerning a location change, and therefore, GM could not have wrongfully withheld consent. The basis for the plaintiffs' cause of action was that GM, after having been informed that Carney Chevrolet was facing eviction, failed to act on the "request" made by Carney Chevrolet to move to the strip mall location. The plaintiffs alleged that this failure to act on the part of GM resulted in Carney Chevrolet's having to temporarily move to the Chrysler dealership, which eventually resulted in the demise of the franchise.

The appellants assert that the three documents that provided sufficient notice to GM are the letter to GM written by Mr. Carney after he was already evicted from his authorized location,[2] the rough sketch given to Mr. Crubaugh at the time of his visit with Mr. Carney, and finally the report prepared by Mr. Stephan which was designed to lure investors into an interest in Carney Chevrolet. We will discuss of each of these in turn.

---

**2.** There is no dispute between these parties that Carney Chevrolet left its approved location and moved into Mrs. Carney's Chrysler dealership without any prior written notice to GM.

The letter that Mr. Carney wrote to GM was clearly not notice to GM of a definite plan for Carney Chevrolet to move to the strip mall location. The letter simply did not contain sufficient information, nor did it contain proof of an agreement between Tucker Realty, the owners of the strip mall, and Carney Chevrolet to move the dealership to this location. At the most, this letter constitutes notice to GM of Carney Chevrolet's eviction. Thus it indicates that Carney Chevrolet had breached its agreement by leaving its approved location without prior written notice and approval from GM, and that Mr. Stephan was still searching for a way to remedy this situation.

Likewise, the rough sketch given to Mr. Crubaugh was nothing more than a preliminary concept or idea of how the site would be designed—assuming that an agreement to purchase the site would ultimately be approved. At the most, it alerts GM that prior to Carney Chevrolet being able to give GM notice of a change in dealership location, a tremendous amount of work would have to be completed by Carney Chevrolet.

Finally, the report prepared by Mr. Stephan is also not sufficient notice to GM that Carney Chevrolet intended to move to a new location. First of all, the report was not directed to GM, but rather was addressed "TO WHOM IT MAY CONCERN" and described a business plan that was meant to lure investors into an interest in Carney Chevrolet. Second, the report was prepared in May 1989 and was not given to GM via Mr. Chester until July 18, 1989. Carney Chevrolet is unable to explain why, if this report was meant as notice to GM, there was a two-month delay in getting the notice to a GM representative. Third, at the time that this report was completed, Carney Chevrolet did not have definite arrangements with Tucker Realty for Carney Chevrolet to move to that location. And finally, at the time that this report was given to GM, Mr. Stephan suggested that he was going to purchase an entirely different piece of real estate, the Murphy property, and lease this land to Carney Chevrolet. In short, the only notice that GM had was that Carney Chevrolet was contemplating a relocation, but had no definite

idea yet as to where—or if—it would be able to relocate.

The notice provision of the dealership agreements required Carney Chevrolet to give notice of any proposed change in the dealership location so that GM could discuss the effect of the proposed change before deciding whether to give its written approval. Implicit in this provision is a requirement that the dealer have a specific plan or proposal for relocation. Otherwise, GM would be unable to adequately discuss and consider the potential effects of the change. There was no concrete plan for relocation in this case. Although Carney Chevrolet had some preliminary ideas about where it might relocate, the dealership had not settled on a specific proposal or even a specific location. GM was merely supplied with bits and pieces of information, orally and in writing, that contradicted each other and clearly did not assert any definite plans for Carney Chevrolet's relocation. The plaintiffs may assert that GM did know that Carney Chevrolet was in financial trouble and yet GM still did nothing. However, it is abundantly clear from the Agreement that GM is not responsible for finding its dealerships new locations; that responsibility lies with the dealership itself.

■ We also agree with the conclusion of the district court that even if the report, the sketch or the letter had met the requirements for notice under the Agreement, the plaintiffs would still face a major stumbling block. In the appellants' brief, it is stated:

In the Court's ultimate conclusion found on page 11 of the Court's Order (App. p. 221) the Court states that the Agreement did not require GM to approve Dealership relocations. However, the clear, unambiguous language of the Agreement provided that no change in the dealership location could occur without the written approval of GM. Thus, the Trial Court's Conclusions (sic) regarding the issue of whether or not General Motors was required to give its written permission for the relocation are clearly erroneous.

Appellant's Brief, pg. 20. The Agreement, despite plaintiffs' allegations, did not expressly require GM to approve any dealer-

ship relocation.[3] As a result, the only way in which the plaintiffs could hope to prevail on their claim that GM wrongfully refused to consent to the relocation would be by showing bad faith on the part of GM. We agree with the district court that it would be impossible for the plaintiff to prove this. On the contrary, the record indicates that GM attempted to work with Carney Chevrolet on its efforts to relocate and waited for over a month to terminate the franchise after Carney Chevrolet clearly violated two provisions of the Agreement. Not only was Carney Chevrolet evicted and, therefore, left its approved location without giving prior written notice, the dealer also moved his business facilities to a competitor's dealership and placed his cars on a used car parking lot. This poor business judgment alone would justify GM's refusal to approve the relocation request.

## III. CONCLUSION

The district court was correct in its determination that proper notice concerning relocation was not given to GM by Carney Chevrolet and also that Al Carney was not a proper plaintiff in this cause of action. Therefore, summary judgment was correctly entered in favor of the defendant and against the plaintiffs. Accordingly, the district court's judgment is AFFIRMED.

---

**3.** *See Woody v. General Motors Corp.*, 9 F.3d 1107 (4th Cir.1993); *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873 (5th Cir.1989). In construing these identical contract provisions, each Court acknowledges that once notice of a requested change is given to GM, GM may *or not may* approve the requested change. "These clauses, which specify Hubbard's location at Utica and flatly preclude relocation absent GM's approval, ... The contract does not limit the reasons upon which GM can base its relocation decisions.... They gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties." *Hubbard,* 873 at 878.