**M.E. FIELDS and J.R. Fields, Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellee.**

No. 96–2913.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1997.

Decided July 24, 1997.

Gerald B. Mullin, William H. Kelly, Jr., Ira M. Levin (argued), Rosenthal & Scanfield, Chicago, IL, for Plaintiffs–Appellants.

Richard C. Godfrey (argued), Thomas E. Dutton, John R. Robertson, Gabriela I. Monahan, Kirkland & Ellis, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, ROVNER and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

■ For fourteen years, from 1971 to 1985, John and Earl Fields, as Fields Cadillac, Inc., owned and operated a Cadillac dealership in Evanston, Illinois. In the early 1980s Cadillacs experienced a temporary decline in popularity, resulting in an "over-dealered" market in the Chicago area. The Fields' dealership sold many fewer cars than previously and was losing money. After considering the options available to them, the Fields decided to give up voluntarily Fields Cadillac's Dealer Sales and Service Agreements with General Motors Corporation (GM). This decision, the Fields now say, was reached only because of an oral contract between the Fields and GM. In that oral contract, according to the Fields, GM promised to give them the next available Cadillac-only dealership in the Chicago area or in Florida. Since the parties now find themselves in federal court, it will come as no surprise that GM denies ever making such a promise, asserting instead that GM promised only to consider the Fields for another suitable Cadillac dealership. After discovery was completed, the district court entered summary judgment for GM. We review the grant of summary judgment de novo, and affirm only if there is no material issue of fact. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994). We find none, and affirm.

The only memorialized version of the alleged agreement, made at the time, supports GM's version of the agreement:

> Cadillac [GM] will give consideration to the applications of Messrs. M.E. [Earl] Fields and J.R. [John] Fields as candidates for a Cadillac dealership that may become available in an area of mutual interest. Cadillac cannot guarantee that the very next available point would be granted to either party. However, Cadillac will consider both parties as being preferred candidates for available points which match their qualifications.

March 25, 1985 letter from C.E. Hendrix, Regional Manager at GM, to M.E. Fields. The Fields assert that, regardless of this memorializing language, they had an oral contract with GM, which provided for GM to give the Fields the next available Cadillac dealership in the Chicago area or Florida. Despite the alleged contract, GM, in 1986, assigned a new Cadillac dealership in Port Richey, Florida to a party other than the Fields. The Fields believed at the time that the assignment of this dealership to someone other than themselves was a violation of their agreement; yet, they say, they accepted GM's proffered excuse as legitimate, and allowed GM to delay the performance of the agreement.

In 1988 GM again breached the alleged agreement. This time, a dealership in Jupiter, Florida was given to another party. The Fields again believed that this action by GM was a violation of their agreement, and again accepted GM's proffered reason as understandable. The Fields believed that the essential agreement remained in force, even if delayed, and took no legal actions to enforce it at that time.

By June of 1992 and still without a new dealership, the Fields had had enough. They[1] sent a demand letter to GM requesting compensation for the goodwill or "blue sky" value of the Evanston Cadillac dealership, which they had given up, since GM had not fulfilled its obligation under the alleged agreement to provide them with a new deal-

---

1. M.E. Fields, Inc. is the successor corporation to Fields Cadillac, Inc. and it was M.E. Fields, Inc. which officially communicated with GM at this time. John Fields signed the letter as Vice-President.

ership. GM wrote back on June 9, 1992, denying the existence of any agreement beyond what was plainly stated in the March 25, 1985 letter quoted earlier. On June 8, 1994, the Fields brought this lawsuit against GM, arguing (1) that the parties had a binding agreement to give the Fields the next available Cadillac dealership in the Chicago area or Florida, (2) that GM breached the agreement with the June 9, 1992 letter disavowing the agreement and (3) that equitable estoppel and promissory estoppel compelled enforcement of the agreement. The district court found that, assuming there was a contract, it had been breached at the latest in 1988, that consequently the statute of limitations had run and, further, that neither equitable estoppel nor promissory estoppel applied to this case.

The Fields and GM disagree about the purported existence of a contract promising the next available Cadillac dealership in Florida or the Chicago area to the Fields in exchange for the Fields' giving up their Evanston dealership.[2] But we believe that, even if the contract had come into existence exactly as the Fields assert, they still would not have a viable claim. Hence, we need not reach the issue of the contract's existence. For purposes of discussion, we will assume the existence of an agreement, entered into in 1985, promising the Fields the next available Cadillac dealership in Florida or in the Chicago area.

### I. Statute of Limitations

■ This lawsuit was filed on June 8, 1994. The relevant statute of limitations is either four years under the Illinois UCC, 810 ILCS 5/2–725, or five years under the Illinois Code of Civil Procedure, 735 ILCS 5/13–205. Thus, unless GM breached the assumed agreement on or after June 8, 1989, the statute of limitations has run. It is undisputed that, when GM gave the Port Richey and

Jupiter dealerships to other dealers, the Fields believed these arrangements to be in breach of the agreement. Thus, with respect to the Port Richey site, Earl Fields said in his deposition: "I felt that they didn't live up to their obligations, but they persuaded me that they had no alternative." M.E. Fields Depo. at 327. And in response to the question whether GM broke its promise when it awarded the Jupiter dealership to another, Earl said "[y]es." *Id.* at 360. It therefore appears that GM breached the alleged agreement, at the latest, in 1988. Thus, the statute of limitations has run.

The Fields argue that, while GM failed to fulfill its obligations with respect to the Port Richey and Jupiter locations, GM had not yet breached the agreement, or, if there had been a breach, it was waived. Instead of a breach, the Fields contend that GM and the Fields agreed to a delay in performance. The essence of the agreement, according to the Fields, was their resignation of the Fields Cadillac dealership in Evanston (instead of a sale) in return for a new Cadillac dealership. This obligation to award a dealership stood, they say, even if the timing condition was waived. The Fields support this argument by pointing to actions on the part of GM that evidence a continued intent to award the Fields a Cadillac dealership. For example, in the spring of 1987 the Fields met with a high-ranking GM officer who promised to notify the Fields of any open locations. And in July, 1988, GM offered the Fields a Gaithersburg, Maryland dealership (which they declined). The Fields also look to the testimony of John Connelly, Director of Dealer Development for GM during the years 1974 to 1987. Connelly testified in his deposition that:

> The intent of [the March 25, 1985 letter] was that if a point became available which would have been satisfactory to the Fields

---

2. Various writings are offered as evidence of the different terms of the alleged agreement. However, even a letter from John Fields to C.E. Hendrix, written on June 7, 1985, upon receipt of GM's March 25, 1985 letter, does not assert that a formal agreement containing a promise had been made. Instead, John Fields remains "hopeful" of a future dealership:

> With reference to your letter dated March 25, 1985, we were somewhat disappointed with the limitations set forth therein, but do understand the difficulties in making this type of commitment. As I am sure you appreciate, we are hopeful that future opportunities will be of an interest sufficient to justify our walking away from a dealership which presently has a substantial market value.

and they had the necessary qualifications, the financial background, the financial wherewithal to establish this point because a new point generally requires a pretty good amount of money because you have to buy land, build buildings, et cetera, that we would give him the first crack at it. Preferred candidate means we'd move him before any other candidate because he was a known commodity to us. He had been a Cadillac dealer. He knew how to sell Cadillacs. So he has some expertise. He has some qualification. May not be as qualified as another person in a given area but if it was in South Florida, we would offer it to him.

. . . .

The word preferred candidate has been used by Cadillac and General Motors for many, many years to indicate a person that was known to us prior to a person who just walks in off the street. And so it was only an indication that if a dealer, for instance, is being migrated from one place to another because he has a track record and we know that he has been able to sell Cadillacs, he would be preferred to a person who's been selling Datsuns for 20 years but never sold a big high-priced car.

Connelly Depo. at 84–86. But all of the evidence that the Fields marshal to support their view that the agreement was still in force after they lost the Port Richey and Jupiter dealerships merely supports the conclusion that GM had a continuing desire to award a new dealership to the Fields. This evidence cannot sustain the view that GM felt *bound* to do so. No issue of material fact is created. The Fields, of course, contend that GM's actions require an interpretation that the parties agreed to delay performance. But these actions only support GM's reading that the "agreement" as fully memorialized in the March 25, 1985 letter continued in effect. That communication bound GM to do no more than *consider* the Fields for any dealerships which might open up. The Fields have not introduced any evidence of a novation continuing an obligation to award a dealership past 1986 or 1988, nor any evidence suggesting that GM ever recognized an obligation towards the Fields, much less a duty after 1986 or 1988. Instead of showing

that the parties agreed to a delay in performance, the Fields only adduce evidence the net effect of which is to indicate that GM fell short of promising to perform. Thus, they fail to point out an issue of material fact. Further, the district court found that the contract, as alleged by the Fields, was for the *next available* Cadillac dealership. Thus the court found that GM's grant of the Port Richey dealership to another party was a breach of the alleged contract and there was then no further agreement to delay performance. *M.E. Fields v. General Motors Corp.*, 932 F.Supp. 212, 216 n. 6 (N.D.Ill. 1996). Therefore, even based on denial of the Jupiter dealership in 1988, the statute of limitations ran, at the latest, in June of 1993, a year before the Fields filed suit.

## II. Equitable Estoppel

 The Fields argue that, even if the statute of limitations has run, GM should be estopped from asserting it as a defense because its actions and statements lulled the Fields into believing that GM would perform the alleged contract. An equitable estoppel theory is not controlled by the limitations period and "takes its life, not from the language of the statute [of limitations], but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice." *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1070 (7th Cir.1978). In examining the Fields' contentions, we must rely on the fundamental principle of equitable estoppel, that "the conduct of the party against whom it is asserted must be such as 'to cause the other party to change his position by lulling him into a false security, thereby causing him to delay or waive the assertion of his rights to his damage.' " *Econ. Fire & Cas. Co. v. GAB Bus. Servs., Inc.*, 155 Ill.App.3d 197, 107 Ill.Dec. 743, 745, 507 N.E.2d 896, 898 (1987) (quoting *Dickirson v. Pac. Mut. Life Ins. Co.*, 319 Ill. 311, 150 N.E. 256, 259 (1925)).

 It is necessary to examine the actions and statements of GM to determine whether it could have reasonably lulled the Fields into believing that GM stood by its alleged promise to give the Fields the next available Cadillac dealership. The Fields

point to two indications of attitude by GM: communications expressing a continued interest in finding a dealership for the Fields, and an absence of communications denying an obligation to do so. For example, the Fields contend that GM's excuses for awarding Port Richey and Jupiter to other dealers show that GM acknowledged its obligation to the Fields, and the offer of the Gaithersburg dealership to them confirms this. Further, the Fields point to John Connelly's deposition in which he admitted that as "an ongoing thing over a couple of years," he became "aware that Mr. Fields thought he was promised a Cadillac point." Connelly Depo. at 137, 136. Connelly also stated that, at most, he told Fields "there's no way you can get a promise. We don't have any points and you can't promise something you don't have." *Id.* at 137. Finally, the Fields assert that the fact that GM never once denied an obligation proves that they understood they had one. But mere silence, in the absence of a special relationship, see *Marks v. Rueben H. Donnelly, Inc.*, 260 Ill.App.3d 1042, 201 Ill.Dec. 393, 400, 636 N.E.2d 825, 832 (1994), or in connection with actions giving rise to an admission, cannot establish equitable estoppel. See, e.g., *AXIA Inc. v. I.C. Harbour Constr. Co.*, 150 Ill.App.3d 645, 103 Ill.Dec. 801, 808–09, 501 N.E.2d 1339, 1346–47 (1986) (defendant engaged in a four-year effort to repair defective building that gave rise to equitable estoppel against expiration of warranty). The actions GM engaged in, offering Gaithersburg to the Fields and explaining why Port Richey and Jupiter could not go to the Fields, do not give rise to an equitable estoppel. Nor does Connelly's knowledge of Earl Fields' belief that there was a promise. Connelly told Fields that GM could not promise the Fields a

dealership.[3] This is sufficient to defeat the Fields' claim of equitable estoppel.

GM further responds by denying that any of these communications or absence of communications can establish that GM recognized any sort of obligation to give the Fields a dealership. Instead, GM says, those matters, plus others, prove only that GM was interested in and willing to give the Fields a dealership should an appropriate one have become available. For example, GM points to a letter signed by C.E. Hendrix (also a signatory to the March 25, 1985 letter) to John Fields, dated April 2, 1990, in which GM indicated that it "would certainly be interested in [the Fields'] specific application and proposal" when another Cadillac dealership became available. Taking this evidence in the light most favorable to the Fields, it fails to create a question of fact whether GM engaged in actions or communications tending to lull the Fields into believing that GM recognized an obligation to provide the Fields with a Cadillac dealership. See, e.g., *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993) (holding that attempts to rehire employee extend statute of limitations only if attempt constitutes effort to prevent employee from suing during limitations period; "an offer to rehire coupled with a request not to file suit" creates grounds to toll limitations period). All of GM's communications reflect GM's version of the agreement: that the Fields were a prime candidate for a new Cadillac dealership because of their history and success with Cadillac, and that GM would like to provide them with another dealership if it could, but that it could not *promise* that it would be able to do so.[4]

## III. Promissory Estoppel

The Fields also argue that GM should be estopped from denying that it

---

3. The Fields state that "no one from Cadillac ever communicated *in writing* that there was no ... agreement." Fields Br. at 7 (emphasis added). They do not dispute Connelly's assertion that he *told* Earl Fields that GM could not promise them a dealership.

4. GM offers, in the alternative, the argument that even if its actions were found to have lulled the Fields into complaisance, the lulling activity ended with the June 9, 1992 letter denying any obligation. Because, according to GM's calcula-

tions, four weeks then remained in the statute of limitations period, the Fields had time to file suit and so cannot rely on the doctrine of equitable estoppel. See *Reat v. Illinois Cent. R.R. Co.*, 47 Ill.App.2d 267, 197 N.E.2d 860, 864–65 (1964). Since the evidence does not support the Fields' reading of GM's acceptance of an obligation, no lulling occurred. Thus we have no need to reach this issue, nor the issue of when, exactly, the statute of limitations expired.

promised a new dealership to the Fields because its actions and statements created a reasonable belief in the Fields that they would be awarded a new Cadillac dealership in exchange for terminating the Evanston dealership. For promissory estoppel to apply here would require that (1) GM have made an unambiguous promise, (2) which was relied on by the Fields, (3) whose reliance was expected and foreseeable by GM and (4) with the result that the Fields suffered a detriment. *Yardley v. Yardley*, 137 Ill.App.3d 747, 92 Ill.Dec. 142, 147, 484 N.E.2d 873, 878 (1985). Assuming that GM did in fact make an unambiguous promise to give the Fields the next available Cadillac dealership in Florida or in the Chicago area, we turn to the nature of the reliance. Here the Fields run into trouble.

The Cadillac dealership in Evanston was assigned not to the Fields, but to Fields Cadillac, Inc. While the alleged promise was made to the Fields as individuals, only Fields Cadillac could sell or retire the dealership. Any "blue sky" or goodwill in the Evanston dealership belonged to Fields Cadillac, not to the Fields. Thus, while the promise was made to the Fields, it was Fields Cadillac that relied, by voluntarily giving up the Evanston dealership. Without having detrimentally relied, the Fields have no claim based on promissory estoppel. And the Fields cannot bring the claim as shareholders of Fields Cadillac. See *Carney v. General Motors Corp.*, 23 F.3d 1154, 1157 (7th Cir. 1994); *Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 693 (7th Cir.1990) ("[Plaintiffs attempting to sue as individuals for harm to their corporation] seek the best of both worlds: limited liability for debts incurred in the corporate name, and direct compensation for its losses. That cushy position is not one the law affords. Investors who created the corporate form cannot rend the veil they wove."). The Fields' other claimed personal losses, including lost salaries and lost profits from the new dealership, are similarly barred. Without detrimental reliance, there can be no claim for recovery under promissory estoppel.

Because we find that, even assuming an agreement in 1985 between the Fields and GM, the Fields no longer have a cause of action, the grant of summary judgment is

AFFIRMED.