[No. A063549. First Dist., Div. Five. Sept. 30, 1994.]

DAVID NADEL et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

**COUNSEL**

David J. Beauvais for Plaintiffs and Appellants.

Crosby, Heafy, Roach & May, Paul D. Fogel, David R. Fredrickson, Thomas R. Burke and Valarie Mark for Defendants and Respondents.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

In this case we hold that the standard of malice set forth in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95

A.L.R.2d 1412], requiring a public official or public figure to prove knowledge of falsity or reckless disregard of the truth in order to establish a news media defendant's liability for defamation, also applies to defamation actions against *government* defendants.

David Nadel and Carol Ruth Denney appeal from a defense judgment in their defamation action against The Regents of the University of California and four university employees, arising from the employees' statements concerning purportedly violent and destructive conduct by Nadel and Denney in opposing the construction of volleyball courts at People's Park in Berkeley. The court ruled that Nadel and Denney were public figures and failed to present evidence of malice. We affirm.

## II. FACTS AND PROCEDURE

### A. *History of People's Park*

People's Park, comprising 2.8 acres of open space, has been a subject of great controversy for more than 30 years. The University of California (University) acquired the property in the early 1960's, intending to use it for student housing, but this plan went awry in the face of widespread opposition, which led to full-scale street battles between protestors and police in 1969. By the 1980's, the park had become a refuge for the homeless.

From 1987 through 1991, the University and the City of Berkeley devised a plan for joint management of the park: a portion of the property would be leased to the city for development and maintenance as a city park, and the remainder would be developed and maintained by the University as an outdoor recreational facility. The first stage of the plan called for the University to construct two sand pit volleyball courts in a corner of the park. Construction began on July 31, 1991.

### B. *Opposition to the Volleyball Courts*

A group of protestors, the People's Park Defense Union (hereafter Union), opposed the construction of the volleyball courts, and in a series of fliers warned of violent consequences. One flier declared, "IF IT IS CLASS WAR THEY WANT IT IS CLASS WAR THEY WILL GET," as well as "THEY TRY IT—WE RIOT!" and "We must impress upon these ruling class, selfish, and mean spirited pricks that their BMWs and Mercedes [*sic*] will not be safe on the streets of Berkeley nor will construction sites for condos and UC or yuppie developments. They may be capable of suppressing mass actions, but will not be able to cope with a guerrilla campaign of attrition and retribution." Another flier announced "a summer-long campaign of direct action

aimed at making life impossible for those who would build on Peoples [*sic*] Park." Yet another warned potential contractors that their tools and equipment would be "subject to regular monkey wrenching" and their day's work would be "done in during the night."

As construction of the courts progressed to completion and public use commenced, opposition by the Union escalated, sometimes with violent results. There were incidents of vandalism and damage to the courts, confrontations between protestors and court users, and—as promised—rioting.

Nadel and Denney were members of the Union and were active and vocal opponents of the volleyball courts. Nadel spoke out against park development at city council meetings and at public demonstrations, helped organize public events in the park, wrote a letter to the editor of a local newspaper and an "open letter" to the University and the city addressing the development issue, and spoke to print media reporters who included his comments in articles about the People's Park controversy. Denney also spoke out against park development at city council meetings and made antidevelopment speeches at political and cultural events. Additionally, she participated in a press conference regarding an incident at a demonstration in which she was arrested.

### C. *The Purported Defamation*

On January 10, 1992, the University sued the Union, Nadel, Denney and two other activists for damages and injunctive relief, and obtained a temporary restraining order (TRO) enjoining the defendants from committing acts of violence and vandalism against University employees and property. During the next several months, four University employees—the individual defendants in the present defamation action—issued press releases and made statements to the press and the public regarding the University's lawsuit and the TRO, in which Nadel and Denney were characterized as perpetrators of violence and destruction of property.

On the day the University filed its lawsuit, Jesus Mena, a public information officer, issued a press release explaining that the lawsuit was "aimed at deterring the campaign of destruction and violence against University of California at Berkeley facilities, students, and employees—as well as park and community users—by the People's Park Defense Union and several of its principal members." The press release referred to "numerous specific acts of violence committed by these parties" as well as "repeated threats of violence."

Mena's press release was accompanied by a written statement by Vice-Chancellor Daniel Boggan, Jr., which included the following assertions:

"During the past several months, a small group of individuals has maliciously endangered public safety through continuing acts of violence intended to destroy University property and injure or intimidate people who use University facilities. [¶] . . . . This small band of individuals, dissatisfied with the current plans for People's Park, are [sic] using fear and violence in an attempt to impose their [sic] will on the community. . . . [¶] The University believes that the imposition of legal sanctions against these parties will help to diminish the threat posed by tactics of intimidation, and will protect not only the safety of the public, but perhaps more importantly, the rights of *all* the people." (Original italics.)

An article in the Daily Californian dated January 27, 1992, quoted Milton Fujii, the University's community affairs director, as stating, "These are folks who have shown a repeated pattern of violent or destructive actions, (and who are) most responsible for the damage and violent acts."

An article in the East Bay Express dated March 13, 1992, quoted University attorney Christine Helwick as stating, "We are not after anyone except those who have a history of violent conduct." A subsequent article in the San Francisco Weekly quoted Helwick as stating, "There has been a deliberate, violent campaign to hinder the university's ability to transition this property into a park."

On March 25, 1992, Vice-Chancellor Boggan issued a press release on the costs incurred by the University in the development of People's Park, in which he stated that "a few individuals have committed themselves to obstructing, through sometimes violent and destructive tactics, every attempt by the University and the City to restore a healthy environment at the park. . . . [¶] Although small in number, those who have continually shown wanton disregard for other people's rights and well-being pose a serious threat to public safety that cannot be ignored." The press release concluded with an affirmation of the University's commitment to pursue "litigation to deter perpetrators of violent and destructive acts." On April 8, 1992, this press release was quoted in the Berkeleyan.

Finally, in a letter dated July 9, 1992, replying to a citizen's letter concerning the University's lawsuit, Vice-Chancellor Boggan said, "These individuals stated that their goal was to sabotage University facilities at People's Park and to undermine the agreement between the University and the City . . . . Unable to alter the consensus through debate and reasoned discourse, they resorted to the use of fear and violence to impose their will on the community."

## D. *The Present Litigation*

In 1993, Nadel and Denney sued the University, Mena, Boggan and Helwick for civil rights violations and defamation. Fujii, against whom Nadel and Denney had filed a cross-complaint for defamation in the University's lawsuit, was later severed from that case and joined in the present action. The University and the individual defendants moved for summary adjudication as to defamation, asserting Nadel and Denney were public figures and could not demonstrate "constitutional" malice—i.e., knowledge of falsity or reckless disregard of the truth—as required by *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pages 279-280 [11 L.Ed.2d at page 706].[1] The defendants also moved, unopposed, for judgment on the pleadings on the civil rights claims.

The court granted summary adjudication and judgment on the pleadings, and rendered a defense judgment. In a written order, the court explained that Nadel and Denney were limited-purpose public figures by virtue of having "thrust themselves to the forefront" of the People's Park controversy (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 808-809, 94 S.Ct. 2997]), and had failed to produce evidence of constitutional malice.

## III. DISCUSSION

### A. *Applicability of New York Times Standard*

■■■■ The primary claim asserted by Nadel and Denney is that a government defendant in a defamation action is not protected by the First Amendment, and hence the *New York Times* standard of constitutional malice is inapplicable. Their brief argues that the First Amendment "exists not to protect government but especially to protect its dissenters" and "is designed to curb, not enhance, government's already formidable power." This is an issue of first impression.

Nadel and Denney also contend they were not limited-purpose public figures and produced evidence of constitutional malice. Before reaching those issues, we must first decide whether they are germane at all—i.e., whether the *New York Times* standard, which poses them, applies in the present case.

---

[1]The parties employ, and we adopt, the term "constitutional" malice in order to distinguish the *New York Times* definition of malice from common law malice (see, e.g., Civ. Code, § 3294, subd. (c)(1)).

We use the terms "government" and "government defendant" throughout this opinion to refer to both a *public entity*[2] and its *employees* acting within the scope of their employment. ■ Under California law, a public entity may be held vicariously liable for the conduct of its employees acting within the scope of their employment, but *only* to the extent that the employees may be held liable. (Gov. Code, § 815.2, subd. (a); *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 819 [131 Cal.Rptr. 854].) The University's liability is dependent upon liability of the individual defendants—so that if *New York Times* protection applies to the individual defendants, it necessarily extends to the University. Thus, in the context of this case, when we refer to conduct by "government" and "government defendants," we are actually referring to the conduct of the individual University employees, from which any liability of the University is derivative. The various policy considerations implicated in this case arise from the individual defendants' conduct as University employees acting within the scope of their government employment, not from the University's institutional conduct.

### 1. *Decisional background*

Our analysis begins with an overview of the *New York Times* standard, its subsequent development, and the extent to which it remains undeveloped.

■ The United States Supreme Court held in *New York Times Co. v. Sullivan, supra,* 376 U.S. at pages 279-280 [11 L.Ed.2d at pages 706-707], that the constitutional guarantee of freedom of speech requires "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The court's primary rationale was that a contrary rule compelling a critic of official conduct to guarantee the truth of factual assertions would inhibit the "vigor" and "variety" of public debate. (*Id.* at p. 279 [11 L.Ed.2d at p. 706].) Subsequent decisions explained that the creation of the *New York Times* standard of malice represents an "accommodation" between the constitutional interest in promoting unfettered debate on public issues and the limited state interest in protecting citizens from libel. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 343 [41 L.Ed.2d at p. 807]; *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 153 [18 L.Ed.2d 1094, 1110, 87 S.Ct. 1975].)

---

[2]The University of California is a "public trust . . . with full powers of organization and government . . . ." (Cal. Const., art. XI, § 9, subd. (a).) Its Regents "have been characterized as 'a branch of the state itself' (*Pennington v. Bonelli* (1936) 15 Cal.App.2d 316, 321 [59 P.2d 448]) or 'a statewide administrative agency' (*Ishimatsu v. Regents of University of California* (1968) 266 Cal.App.2d 854, 864 [72 Cal.Rptr. 756])." (*Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135 [143 Cal.Rptr. 276].)

The plaintiff in *New York Times* was a public official. In *Curtis Publishing Co.* v. *Butts, supra*, 388 U.S. at page 155 [18 L.Ed.2d at page 1111], the Supreme Court extended the *New York Times* rule to cases where the plaintiff is a public figure. In *Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. at page 345 [41 L.Ed.2d at pages 808-809], the Supreme Court described two types of public figures: "Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." The latter become public figures "for a limited range of issues." (*Id.* at p. 351 [41 L.Ed.2d at p. 812].)

Each of these cases involved *news media defendants*. The Supreme Court has never said whether the *New York Times* rule applies in litigation by a public official or public figure against an individual defendant who is *not* a member of the news media. In fact, the court has expressly refrained from deciding that issue. (*Hutchinson* v. *Proxmire* (1979) 443 U.S. 111, 133-134, fn. 16 [61 L.Ed.2d 411, 430, 99 S.Ct. 2675].)

Numerous *state* courts have held, as a general proposition, that the *New York Times* rule does indeed apply to nonmedia defendants, usually on the theory that there is no basis for affording greater protection to the media than to ordinary citizens. (E.g., *Anderson* v. *Low Rent Housing Com'n, etc.* (Iowa 1981) 304 N.W.2d 239, 247; *Vandentoorn* v. *Bonner* (1983) 129 Mich.App. 198 [342 N.W.2d 297, 301-302]; *Britton* v. *Koep* (Minn. 1991) 470 N.W.2d 518, 521; *Casso* v. *Brand* (Tex. 1989) 776 S.W.2d 551, 554; see Annot., Defamation: Application of New York Times and related standards to nonmedia defendants (1985) 38 A.L.R.4th 1114.) This includes California. In *Miller* v. *Nestande* (1987) 192 Cal.App.3d 191, 200 [237 Cal.Rptr. 359, 62 A.L.R.4th 301], the court concluded: "Whether criticism of public officials is published by the media or disseminated by individuals, we hold it is protected by the constitutional standard expressed in *New York Times*." (Fn. omitted.) This approach finds support from Justice William J. Brennan, Jr., who observed in 1985 that ". . . at least six Members of this Court . . . agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 783-784 [86 L.Ed.2d 593, 618-619, 105 S.Ct. 2939] (dis. opn. of Brennan, J.).)

No court, however, has decided the specific question whether the *New York Times* standard applies to a defendant that is not only not a member of

the news media, but is a *governmental entity or public official*.[3] This may be because in many (if not most) cases of purported defamation by the government, some statutory or common law privilege or immunity will apply. (See, e.g., Civ. Code, § 47, subds. (a) [privilege in discharge of official duty] & (b) [privilege in legislative, judicial, or other official proceeding]; Gov. Code, § 820.2 [immunity for discretionary act of public employee].)

The present case requires a resolution of that specific *New York Times* question. The defendants claim no statutory privilege or immunity, and case law suggests none is applicable here. (See *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 412-415 [134 Cal.Rptr. 402, 556 P.2d 764] [no official duty privilege or discretionary act immunity where county clerk made defamatory statements to newspaper reporter]; *Toney* v. *State of California* (1976) 54 Cal.App.3d 779, 792-793 [126 Cal.Rptr. 869] [college's decision to issue press release an immune discretionary act, but timing, content and manner of release a nonimmune "operational" implementation of policy]; see also *Susan A.* v. *County of Sonoma* (1991) 2 Cal.App.4th 88, 93-97 [3 Cal.Rptr.2d 27].)

## 2. *Competing interests*

■ In deciding this issue, we are compelled to pursue an "accommodation" similar to that achieved by *New York Times* and its progeny. In doing so, we confront the two competing themes underlying *New York Times*—the First Amendment right of the people to the unfettered interchange of ideas, versus the state interest in protecting citizens from libel—plus a third theme, the overarching constitutional interest in protecting people from abuses of governmental power.

### a. *Unfettered interchange of ideas*

On the one hand, the United States Supreme Court has repeatedly stressed that the First Amendment " 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 269 [11 L.Ed.2d at p. 701], quoting *Roth* v. *United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 1506-1507, 77 S.Ct. 1304]; accord, e.g., *Dun & Bradstreet,*

---

[3]The defendants in *Anderson* v. *Low Rent Housing Com'n, etc., supra,* 304 N.W.2d 239, were a public agency and public employee; the court held the *New York Times* standard "applies to both media and nonmedia defendants" (*id.* at p. 247), but did not address or decide the more specific question whether *New York Times* applies to a nonmedia *government* defendant. (See also *McDowell* v. *Paiewonsky* (3d Cir. 1985) 769 F.2d 942, 951 [applying *New York Times* in defamation action against legislator without acknowledging or deciding applicability issue].)

*Inc.* v. *Greenmoss Builders, supra,* 472 U.S. at p. 759 [86 L.Ed.2d at pp. 602-603]; *Connick* v. *Myers* (1983) 461 U.S. 138, 145 [75 L.Ed.2d 708, 718-719, 103 S.Ct. 1684].) The central concern is not simply the right of the news media to immunity, but "the interests of the *community* in free circulation of information" (*Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at p. 153 [18 L.Ed.2d at p. 1110], italics added)—that is, "the rights of *listeners* to 'the widest possible dissemination of information from diverse and antagonistic sources.'" (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. at p. 783 [86 L.Ed.2d at pp. 618], italics added (dis. opn. of Brennan, J.), quoting *Associated Press* v. *United States* (1945) 326 U.S. 1, 20 [89 L.Ed. 2013, 2030-2031, 65 S.Ct. 1416].) "The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source . . . ." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 777 [55 L.Ed.2d 707, 718, 98 S.Ct. 1407].)

With the proper focus on the rights of listeners to receive information rather than on the identity of the speaker, it would seem irrelevant, for purposes of First Amendment applicability, whether the speaker is media or not, and government or not. This point favors application of First Amendment protections, and hence the *New York Times* standard, to government defendants, just as it has been relied upon to favor application of the standard to nongovernment nonmedia defendants. (E.g., *Miller* v. *Nestande, supra,* 192 Cal.App.3d at p. 198.)

Moreover, a persuasive case can be made that government has a legitimate role to play in the interchange of ideas. "Government has legitimate interests in informing, in educating, and in persuading. If government is to secure cooperation in implementing its programs, if it is to be able to maintain a dialogue with its citizens about their needs and the extent to which government can or should meet those needs, government must be able to communicate. An approach that would invalidate all controversial government speech would seriously impair the democratic process." (Shiffrin, *Government Speech* (1980) 27 UCLA L.Rev. 565, 606 [hereafter Shiffrin]; see also Tribe, American Constitutional Law (2d ed. 1988) p. 807 [government can "add its own voice to the many that it must tolerate, provided it does not drown out private communications"]; *Miller* v. *California Com. on Status of Women* (1984) 151 Cal.App.3d 693, 701 [198 Cal.Rptr. 877] ["If the government cannot address controversial topics it cannot govern."].)

Even the preeminent critic of unrestricted government speech, University of Texas Professor Mark G. Yudof (see *post,* at pp. 1264-1265), concedes that ". . . government is sometimes uniquely situated to gather and disseminate particular types of information. And in some governments may be

virtually the only entities with resources willing to present a particular side of a public issue." (Yudof, When Government Speaks (1983) p. 46 [hereafter Yudof].)

For example, in California, the Director of the Department of Consumer Affairs is statutorily required to disseminate to the public information concerning "[c]ommercial and trade practices which are detrimental to consumers" (Bus. & Prof. Code, § 335, subd. (b)) and concerning "[g]oods and services which are unsafe, unhealthful or inimical to the general welfare of consumers" (Bus. & Prof. Code, § 335, subd. (c)). In certain situations, the Department of Consumer Affairs might be uniquely situated to acquire such information, yet in carrying out the informing function—e.g., apprising the news media of detrimental trade practices by specific individuals—might invite a defamation lawsuit absent First Amendment protection. Withholding the *New York Times* standard—i.e., compelling the agency to guarantee the truth of factual assertions—could inhibit the agency's performance of its informing function, to the ultimate detriment of consumers.

A secondary rationale of the *New York Times* decision was that because statements by public officials are generally protected by conditional immunity, i.e., absent malice, "[i]t would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to the officials themselves." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 282-283 [11 L.Ed.2d at p. 708].) The court characterized its newly created standard as "appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen." (*Id.* at p. 282 [11 L.Ed.2d at p. 707], original italics.) This constitutional tit for tat is absent where, as is evidently the case here, the government defendant is *not* protected by statutory privileges and immunities. Thus, it makes sense to extend the *New York Times* standard to government defendants in such situations, in order to maintain the balance sought by the Supreme Court in creating that standard.

### b. *Protection of vulnerable citizens from defamation*

On the other hand, in deciding when to apply the *New York Times* standard, the United States Supreme Court has focused on the relative vulnerability of the plaintiff to injury from defamation. The court has explained that public officials and public figures are not especially vulnerable to defamation by the news media, and thus are less in need of protection (i.e., the *New York Times* standard applies), because they "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than

private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808], fn. omitted.) Relying in part on the increased vulnerability of private persons to injury from media defamation, the court concluded: "Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*." (*Id.* at p. 348 [41 L.Ed.2d at p. 810].)

If a plaintiff's relative vulnerability is a proper focus of First Amendment analysis, it works *against* application of the *New York Times* standard to government defendants. This is because government—federal, state, and perhaps to a lesser extent local—possesses a unique advantage over the individual citizen in a war of words. "One need only notice the ready access of government officials to the mass media, the franking privilege, the constant stream of legislative and executive reports and publications, and the massive system of direct grants and indirect subsidies to the communications process (including federal financing of elections) to recognize that speech financed or controlled by government plays an enormous role in the marketplace of ideas." (Shiffrin, *supra,* at p. 569, fns. omitted.) Professor Yudof warns, "Expression by government is critical to democratic processes, but the power of governments to communicate is also the power to destroy the underpinnings of government by consent. The power to teach, inform, and lead is also the power to indoctrinate, distort judgment, and perpetuate the current regime." (Yudof, *supra,* at p. 42.) To the latter list can be added the power to *defame*.

The extent of this concern is debatable in light of general post-Watergate skepticism about anything the government has to say. One commentator argues, "Because an enormous quantity of antigovernment communications is available, and because almost no segment of the media seems unwilling to criticize the government when the occasion arises, it is unlikely that government speech has any special persuasive powers by virtue of its governmental origins. On the contrary, antigovernment biases may be so great, particularly with reference to the veracity of political leaders, that much government speech may encounter a public strongly predisposed to disbelief." (Schauer, *Is Government Speech a Problem?* (1983) 35 Stan.L.Rev. 373, 381.) And a similar claim of plaintiff vulnerability could be made as to any "big media" defendant. (See Tribe, American Constitutional Law, *supra,* (2d ed. 1988) p. 809, fn. 16.)

But while public suspicion of government has certainly increased in the past few decades, we believe that government speech, imbued as it is with

the imprimatur of state authority, still retains a special force that media speech lacks. This is no less true—the impact upon the plaintiff is the same—where, as here, the government speaks not institutionally but through the voice of its employees acting within the scope of their employment, a prerequisite for public entity liability under Government Code section 815.2 (see *ante*, pp. 1258-1259). This concern must be accommodated in addressing the issue of government liability for defamation.

Moreover, if citizens are indeed more vulnerable to government defamation because of the unique power and authority of the state, there may be a special danger that they will refrain from exercising their First Amendment right to criticize government, for fear of retaliatory defamation—with the result that the interchange of ideas is inhibited. This danger, however, is far greater where government is conferred with *absolute* privilege (see *Barr* v. *Matteo* (1959) 360 U.S. 564, 584-585 [3 L.Ed.2d 1434, 1448-1449, 79 S.Ct. 1335] (dis. opn. of Warren, C. J.)) than where, as here, we consider conferring what is in effect a *conditional* privilege dependent on the absence of constitutional malice. Government will be less likely to retaliate if malicious defamation is actionable than if *no* defamation is actionable.

### c. *Impropriety of government invoking First Amendment*

There is a third concern here, not implicated in *New York Times* and its progeny—the notion asserted by Nadel and Denney that the First Amendment does not protect government from its citizens, but only citizens from government.

Simple as this notion appears, it has considerable merit, as well as persuasive defenders. Professor Yudof, a forceful advocate for limiting the extension of First Amendment protections to government speech, has argued, "The First Amendment has been viewed historically as involving limitations on government, not as a source of government rights. Constitutional rights like those embodied in the Bill of Rights have not been extended to government bodies, but only to individuals and groups within the private sector. . . . It would be standing the world on its head to think that the extension of First Amendment rights to private sector organizations requires a constitutionalization of government expression in order to counter the distortions brought about by such private institutions." (Yudof, *supra*, at pp. 44-45, fns. omitted.) Similarly, Justice Potter Stewart has commented, "The First Amendment protects the press *from* governmental interference; it confers no analogous protection *on* the Government." (*Columbia Broadcasting* v. *Democratic Comm.* (1973) 412 U.S. 94, 139 [36 L.Ed.2d 772, 804-805, 93 S.Ct. 2080], original italics (conc. opn. of Stewart, J.).)

Moreover, as a practical matter, government may not have an overwhelming *need* for First Amendment protection. "Governments, particularly the federal government, are not fledgling communicators, needing protection from the community's excesses; they may pose more of a threat than do corporations. The emasculation by state or federal courts of the government's power to communicate, or self-emasculation of these powers by other branches of government, is unlikely. Policy reasons may warrant protection of government speech for the good of all. But it is inconceivable that governments should assert First Amendment rights antagonistic to the interests of the larger community." (Yudof, *supra*, at p. 45, fn. omitted.)

The overarching constitutional focus on protecting citizens from abuses of government power, rather than protecting government from its citizens, is a substantial counterbalance against the argument that the First Amendment purpose of assuring unfettered interchange of ideas favors application of First Amendment protections, and hence the *New York Times* standard, to government speech. In Professor Yudof's words, "The 'right to know' formulation simply obfuscates the problem of how and why governments should have rights against the community under a First Amendment designed to limit government powers." (Yudof, *supra*, at p. 47.)

### 3. *Striking a balance*

Is there a way out of this constitutional conundrum? Can we strike a balance that accommodates all three of these competing concerns? We believe so.

We begin with the proposition that *any* potential liability of government for publishing a defamatory statement is itself a check on government abuse of its power to defame. Professor Yudof has himself characterized "laws . . . holding government or its officers liable for defamation" as one source of protection "from overzealousness in government speech." (Yudof, *supra*, at p. 188.) Thus, even if the *New York Times* standard is applied to government speech, governments still face the threat of liability (assuming no privilege or immunity) for defamatory speech that is constitutionally malicious. This threat, though limited in practical application, provides at least a baseline level of protection to a vulnerable citizenry from abuse of government power.

Next, if government has a legitimate role to play in the interchange of ideas—as we conclude it does—then government should have some measure of protection in performing that role, at least as to matters of public interest. Otherwise, if government is compelled to guarantee the truth of its factual

assertions on matters of public interest, its speech would be substantially inhibited, and the citizenry would be less informed. Thus, it is appropriate to extend the limited First Amendment protection of the *New York Times* standard to government speech, so that government may be held liable for defamation of a public official or public figure (i.e., in matters of public interest) only where there is knowledge of falsity or reckless disregard of the truth. This also maintains the balance of conditional privilege between criticism *of* government and criticism *by* government in the absence of statutory privileges and immunities.

Finally, regarding the point that extension of First Amendment protection to government is inconsistent with the notion that the constitution protects citizens from government rather than government from citizens, our best answer is that if the unfettered interchange of ideas is a central concern of the First Amendment, then application of the First Amendment to government speech in the context of limited protection from liability for defamation is entirely consistent with First Amendment dogma, in that it promotes government's contribution to the marketplace of ideas. Moreover, in California, where a public entity's tort liability is derivative of employee liability (Gov. Code, § 815.2; see *ante*, pp. 1258-1259), our primary concern is with the extension of First Amendment protection not to the entity but to the *employee*, who should not be treated as having relinquished the protection of the First Amendment by virtue of government employment.

We conclude that application of the *New York Times* standard of constitutional malice to government defendants in defamation cases represents an appropriate accommodation of the three competing interests implicated in this context of government speech.[4]

We are not entirely on our own in reaching this conclusion. Professor Yudof views *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675] as pointing in the same direction. (Yudof, *supra*, at p. 286.)

In *Hutchinson*, research scientist Ronald Hutchinson sued Senator William Proxmire and his legislative assistant for defamation after receiving Senator Proxmire's "Golden Fleece" award for wasteful government spending. The court held that in describing the award to Hutchinson in newsletters and a press release, the defendants were not immune under the speech or debate

---

[4]Nadel and Denney suggest there are procedural due process implications to such application of *New York Times*, citing cases holding that government may not take administrative action which harms a person's reputation without affording notice and an opportunity to be heard. (E.g., *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 436-437 [27 L.Ed.2d 515, 518-519, 91 S.Ct. 507].) Those cases are inapposite, however, as the challenged statements in the present case neither constituted nor were part of any administrative action.

clause of the United States Constitution, which states that "for any speech or debate in either house," members of Congress "shall not be questioned in any other place" (U.S. Const., art. I, § 6), because the newsletters and press release were not essential to the deliberations of the Senate or part of the Senate's deliberative process. (*Hutchinson* v. *Proxmire, supra,* 443 U.S. at p. 130 [61 L.Ed.2d at p. 428].)

The court also held Hutchinson was not a public figure under the *New York Times* standard of constitutional malice. (443 U.S. at pp. 133-136 [61 L.Ed.2d at pp. 430-432].) The court said its conclusion that Hutchinson was not a public figure "makes it unnecessary" to decide "whether the *New York Times* standard can apply to an individual defendant rather than a media defendant." (*Id.* at pp. 133-134, fn. 16 [61 L.Ed.2d at p. 430].) Nevertheless, the Court's careful consideration whether Hutchinson was in fact a public figure suggests that issue was pivotal, and a different result might well have obtained (i.e., no liability for defamation absent malice) had Hutchinson been a public figure.

Professor Yudof believes the decision in *Hutchinson* "goes a long way toward extending *New York Times* v. *Sullivan* to libel and slander by public officials. Thus, certain types of objectionable speech by public officials may lead to damage recoveries by those injured, thereby serving the important function of limiting what government officers may say—particularly as they rely on the prestige of their official positions. On the other hand, 'vigorous debate on public issues' is not diminished by the drastic alternative of enjoining government and its officers from speaking out. The accommodation of the needs to promote and to circumscribe government expression reached in *Hutchinson* is both wise and workable." (Yudof, *supra,* at p. 286, fn. omitted.)

In light of the Supreme Court's express disclaimer of a decision whether *New York Times* applies to nonmedia defendants, we hesitate to ascribe as much significance to *Hutchinson* as does Professor Yudof. Nevertheless, we agree that application of the *New York Times* standard to government speech accommodates the competing needs both to promote and to circumscribe government expression, and is "wise and workable." (Yudof, *supra,* at p. 286.)

### 4. *Conclusion*

We are acutely mindful of the danger that government may abuse its power to speak. Events of the past few decades have demonstrated that government is quite capable of misleading the public and defaming its citizens. But we also perceive that government has a legitimate role to play in the interchange of ideas. In determining the extent to which government

speech implicates the First Amendment in the context of government liability for defamation, we are compelled to accommodate three competing interests—the First Amendment interest in promoting the unfettered interchange of ideas, the state interest in protecting citizens from the power of government to defame them, and the overarching constitutional interest in protecting citizens from government rather than government from its citizens —and to draw a line between government's legitimate expression of ideas and its abuse of the power to speak. We believe the *New York Times* standard of constitutional malice provides a fair and feasible measure for determining whether government has stepped over that line.

It remains only for us to decide whether the trial court correctly determined that Nadel and Denney were limited purpose public figures and failed to produce evidence of constitutional malice.

## B. *Public Figure Status*

■ The court correctly ruled that Nadel and Denney were public figures by virtue of having "thrust themselves to the forefront" of the People's Park controversy. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 345 [41 L.Ed.2d at p. 808].)

Nadel spoke publicly at city council meetings and demonstrations. He wrote a letter to the editor of a local newspaper and an "open letter" to the University and the city, and spoke to print media reporters who included his comments in articles about People's Park. He also regularly staffed an "information table" on Sunday afternoons in the park. There can be no reasonable doubt that he thrust himself to the forefront of the controversy "in order to influence the resolution of the issues involved." (418 U.S. at p. 345 [41 L.Ed.2d at p. 808]; see *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190 [31 Cal.Rptr.2d 193] [public figure status where plaintiff approached publisher of one article and expressed concern over issue, and encouraged interest of writer of another article].)[5]

This conclusion is bolstered by Nadel's own comments in a letter he wrote to one of the regents after the University filed its lawsuit, in which he asserted, "We've gotten great local press, and I've been on 6 radio stations with 11 more scheduled. After radio then T.V. I will make my case throughout California." Public figures "usually enjoy significantly greater access to

---

[5]Nadel points to numerous newspaper and magazine articles about the People's Park controversy in which he was *not* mentioned. The proper focus, however, is not on the degree of media attention he received, but his attempt "to influence the resolution of the public issues involved." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254 [208 Cal.Rptr. 137, 690 P.2d 610], fn. omitted.)

the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) By Nadel's own account, that characterization would certainly apply to him.

Denney seems to have been somewhat less prominent in the People's Park controversy, but she nevertheless thrust herself to its forefront. Like Nadel, she spoke publicly at city council meetings and at political and cultural events. She also invited publicity by participating in a press conference regarding an incident at a demonstration in which she was arrested. The court properly determined that both plaintiffs were limited-purpose public figures.

C. *Absence of Constitutional Malice*

■   Likewise, the court correctly ruled that Nadel and Denney failed to produce evidence of constitutional malice.

There was no evidence the defendants knew their statements were false. The four individual defendants each asserted in declarations, without contradiction, that they believed at all times that the statements were true.

Nor was there evidence of reckless disregard of the truth—i.e., that the defendants "in fact entertained serious doubts as to the truth" of their statements. (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].) To the contrary, the evidence demonstrated reliance on information from reputable sources, and no reason to doubt the accuracy of that information, which relieves a publisher of any obligation to investigate personally. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259; *Church of Scientology Intern.* v. *Daniels* (4th Cir. 1993) 992 F.2d 1329, 1334.)

The University, in support of its application for a TRO, presented declarations by University employees describing several acts of vandalism and battery by Nadel and Denney, including the following: On August 9, 1991, Denney threw thorn-stemmed roses into the volleyball court sand pit, and tried to kick a volleyball player but missed and kicked a University employee instead. On the weekend of August 10-11, 1991, Nadel and some others ripped down the volleyball nets, causing the nets to graze the face of a University employee. On September 28, 1991, Nadel, Denney and other protestors moved a portable toilet from park premises into a street. And on January 4, 1992, Nadel pushed a University employee who was removing a leaflet Nadel had posted on a lamppost.

More generally, the employees described Nadel and Denney as frequent participants in the People's Park protests, which indisputably became violent and destructive.

In contrast, Nadel and Denney presented no evidence tending to show reckless disregard of the truth. Nadel merely asserted in a declaration, "At no time have I ever committed an act of *unprovoked* violence against any person in People's Park nor have I ever been accused in a court of law, or convicted of any such act." (Italics added.) He did not disclaim acts of violence he would view as "provoked." Denney merely asserted generally in her declaration that she had never committed acts of "destruction of property or injury to persons" in People's Park. She did not disclaim the specific acts attributed to her by the University employees (though she characterized her attempt to kick one of the volleyball players as self-defense). Neither plaintiff showed any reason for the University to doubt the accuracy of its employees' reports.[6]

In short, the University employees' reports of specific acts of vandalism and battery by Nadel and Denney, along with the plaintiffs' general immersion in a cause which degenerated into destruction and rioting, were grounds for reliance by the defendants in characterizing the plaintiffs as perpetrators of violence and destruction of property. Those characterizations might have been untrue, or at least exaggerated, but their support in the record precludes any determination that they were asserted with *reckless disregard* as to their truth. The court properly concluded there was no evidence of constitutional malice.

## IV. DISPOSITION

The judgment is affirmed.

Peterson, P. J., and Haning, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 22, 1994.

---

[6]Nadel and Denney contend there was evidence of "ill-will," consisting of Vice-Chancellor Boggan's purported statement to an attorney that "[w]e got to wipe those guys out" with the University's lawsuit "because they are organizing against us" at a nightclub owned by Nadel. This was not, however, evidence of constitutional malice, but only common law malice. (See *ante*, fn. 1.)