**J. Fred CREEK, Plaintiff–Appellant,**

v.

**VILLAGE OF WESTHAVEN, et al., Defendants–Appellees.**

No. 95–1465.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1995.

Decided March 19, 1996.

Rehearing Denied April 26, 1996.

Warren S. Radler, Steven R. Merican (argued), Rivkin, Radler & Kremer, Chicago, IL, for J. Fred Creek.

Charles E. Hervas (argued), James G. Sotos, Michael W. Condon, Michael D. Bersani, Hervas, Sotos & Condon, Itasca, IL, Burton S. Odelson, Mark H. Sterk, Odelson & Sterk, Evergreen Park, IL, James J. Roche, Roche & Associates, Chicago, IL, for Village of Westhaven.

Charles E. Hervas, James G. Sotos, Michael W. Condon, Michael D. Bersani, Hervas, Sotos & Condon, Itasca, IL, Burton S. Odelson, Mark H. Sterk, Odelson & Sterk, Evergreen Park, IL, for James P. O'Brien, Lorin Schab, James Graves, James Surdyk, William Rulien, Charles Kidd, Patrick Burke, Eric Conors, Daniel Majewski, Barry Jones, Charles Thompson.

Russell J. Hoover, Jenner & Block, Chicago, IL, Hugh C. Griffin, Richard F. Johnson, Daniel J. Zollner (argued), Leslie J. Rosen, Lord, Bissell & Brook, Chicago, IL, for Village of Orland Park.

Richard T. Wimmer, Dennis G. Walsh, (argued), Klein, Thorpe & Jenkins, Chicago, IL, Edward A. McCarthy, Matyas & Norris, Chicago, IL, for Orland Park School Dist. No. 135.

Hugh C. Griffin, Richard F. Johnson, Daniel J. Zollner, Leslie J. Rosen, Lord, Bissell & Brook, Chicago, IL, for Orland Fire Protection Dist.

Charles E. Hervas, James G. Sotos, Michael W. Condon, Michael D. Bersani, Hervas, Sotos & Condon, Itasca, IL, Mark H. Sterk, Odelson & Sterk, Evergreen Park, IL, for John Arenz, Gregory Wachowiak, Joan Frisk, Merril Singleterry, Rod Ohlrogge.

Before POSNER, Chief Judge, COFFEY, Circuit Judge, and SKINNER, District Judge.*

POSNER, Chief Judge.

The plaintiff in this unfortunately protracted, thirteen-year-old civil rights suit appeals from the dismissal of the suit on summary judgment. The parties have showered us with 198 pages of briefs, but the essential facts, duly simplified, and the legal issues, can be stated briefly. Creek, the plaintiff, is a real estate developer who wanted to build a 216–unit apartment complex in the Village of Westhaven, Illinois. Westhaven, now known as "Orland Hills," is an all-white suburb of Chicago. Creek needed a permit from the Village in order to proceed. All was going swimmingly—the Village was eager for the development—until January 9, 1979, when the Village learned that Creek was asking the U.S. Department of Housing and Urban Development for federal rent support for 40 percent of the units. Creek contends—we must assume for purposes of this appeal correctly—that the Village, knowing that rent support would make the development attractive to black people and wishing to keep Westhaven white, determined to prevent Creek from going forward with the development. So it denied him the permit on pretextual grounds.

* Hon. Walter Jay Skinner of the District of Massachusetts, sitting by designation.

Creek sued in Illinois state court on August 29, 1979, for an injunction against the Village's withholding the permit. The court issued the injunction on April 14, 1980. This was a final judgment, terminating Creek's suit. The Village neither complied with the judgment nor appealed it. A month later the Westhaven Homeowners Association, acting in cahoots with the Village to block Creek's development, sued HUD in federal district court to invalidate HUD's approval of rent support for Creek's development. Creek returned to state court to seek enforcement of the injunction against the Village. On August 28, 1980, the court entered a consent order directing the Village to issue the permit and requiring the Homeowners Association, although it was not a party to the state court suit, to drop the federal suit. Which it did. But the Village defied the consent order by not issuing the permit. Shortly afterward, the defendants, who include not only the Village but also other municipal corporations and a variety of local officials, began what the parties describe as a "letter-writing campaign" but is better described as a far-reaching, concerted effort to enlist the efforts of state and federal officials to prevent Creek from building a rent-supported apartment complex in Westhaven. The motive, we assume for purposes of deciding this appeal, was racial.

On July 1, 1980, Creek had transferred his interest in the development to Pheasant Ridge Venture, a limited partnership in which he retained a 90 percent share as sole general partner, thus giving up 10 percent of his interest. He claims that he was forced to do this by the delays brought about by the defendants' unlawful behavior. A couple of months later Pheasant Ridge Venture transferred its interest to a joint venture with Shell Development Corporation. The joint venture, called PRV/Shell, reapplied for rent support, finally obtaining the necessary financial commitments in March 1983. Construction of the apartment complex was begun then and completed sometime before the end of 1993 (the record is unclear exactly when). PRV/Shell was permitted to intervene as a plaintiff in Creek's federal suit and eventually settled its claims for $1 million, out of which Creek, by virtue of his interest

in the partnership, received some $136,000. The settlement agreement reserved "the individual claims not asserted or which later may be asserted by J. Fred Creek."

■ Creek contends that the complex as eventually built was smaller than it would have been but for the defendants' conduct (only 176 units) and less profitable. He seeks by way of damages the difference between the financial benefits that would have accrued to him had the defendants not delayed the project and the more modest though not negligible benefits that did accrue to him. He claims that the reduction in the size and profitability of the venture reflected, in part, changes in federal law. But he cannot recover damages for any lost profit that is due to those changes even if, as he also argues, he would have gotten the project under way before the changes went into effect had it not been for delay caused by the defendants' unlawful acts. Causation in the law is not to be equated to "but for" causation. E.g., *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995); *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir.1994); *Brackett v. Peters*, 11 F.3d 78, 82 (7th Cir.1993). The delays did not make it more likely that federal law would change adversely to Creek. Therefore those changes cannot be deemed "caused" by the defendants, because, to count as a cause, an act must both be a necessary condition (but-for cause) of the result *and* make the result antecedently more likely to occur. *Id.* at 82; *United States v.1990 Toyota 4Runner*, 9 F.3d 651, 652 (7th Cir.1993). Creek's claim for damages caused by the changes in law would have merit, therefore, only if a delay in the project was itself a cause of legal changes adverse to him. For in that case the delay *would* have made it more likely that Creek would be harmed by changes in the law; it would not have been just a necessary condition, a but-for cause, of that harm.

■ The district judge, however, did not merely throw out part of Creek's damages claim; she threw out Creek's entire suit. The ground was res judicata. The district judge believed that Creek's only viable claim was the claim that he had asserted in the

state court suit filed in 1979. That suit had been concluded by the entry of a final judgment on April 14 of the following year. Creek had actually requested damages in that suit, though he later abandoned that request. Neither the request for damages nor its abandonment has any significance to the issue of res judicata. You cannot split a claim into a request for damages and a request for injunction and litigate each in a separate suit. *Torres v. Rebarchak*, 814 F.2d 1219, 1224 (7th Cir.1987); *Meyers v. Kissner*, 217 Ill.App.3d 136, 160 Ill.Dec. 140, 146, 576 N.E.2d 1094, 1100 (1991), rev'd on other grounds, 149 Ill.2d 1, 171 Ill.Dec. 484, 594 N.E.2d 336 (1992); *Restatement (Second) of Judgments* § 24(1) and comment a (1982). To divide a claim in that way is precisely the vice against which the doctrine of res judicata, in its sense of claim preclusion (as distinct from issue preclusion, or in an older terminology collateral estoppel) is directed.

■ But that is provided that you can obtain both forms of relief in one suit. If, when the claim arises, the amount of damages cannot be quantified, then you can delay bringing your suit for damages until they can be quantified. E.g., *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir.1984); *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 494 (7th Cir.1982); *Meekins v. United Transportation Union*, 946 F.2d 1054, 1058 (4th Cir.1991). We cannot find an Illinois case that says this in so many words, and it is Illinois law that determines the preclusive effect, in this federal suit, of an Illinois judgment. 28 U.S.C. § 1738. There is even some old law in Illinois to the effect that the plaintiff in a suit for breach of an employment contract cannot sue more than once and therefore must wait until the term of the contract expires before he can sue if until then his full damages would be speculative. *Doherty v. Schipper & Block*, 250 Ill. 128, 95 N.E. 74, 76 (1911); *Lewis v. Loyola University*, 149 Ill.App.3d 88, 102 Ill.Dec. 425, 430, 500 N.E.2d 47, 52 (1986). The current validity of the rule is open to question, however, see *Gasbarra v. Park–Ohio Industries, Inc.*, 655 F.2d 119, 122 (7th Cir.1981), and there is no indication that the Illinois courts would extend it beyond the employment setting. We have even

found an Illinois case in which res judicata is said not to apply in the case of a continuing or recurrent wrong, *Airtite v. DPR Ltd.*, 265 Ill.App.3d 214, 202 Ill.Dec. 595, 598, 638 N.E.2d 241, 244 (1994), and this, as we are about to see, when properly qualified, is just another way of saying that you can bring successive suits if you cannot get complete relief in one suit, and describes Creek's second suit exactly.

■ Not only when the state court suit was filed in 1979 but also when it was concluded in April of 1980, and at all times in between, Creek knew that he had lost valuable time but he could not estimate his full damages because he did not know when he would, at last, obtain the permit and the necessary federal financing and thus be able to go forward with the project. He could not—or at least there is no indication that he did—know that in July of 1980 he would have to abandon his hope of developing the apartment complex all by himself and bring in a 10 percent partner, thereby surrendering 10 percent of the profits from the project. Of course, if he surrendered this expectation for a commensurate present-value sum, he would no more be injured than any other entrepreneur who decides to share risk and reward by selling a piece of his enterprise. But we must assume in the present posture of the case that he received inadequate consideration because of his distressed circumstances brought about by the defendants' conspiracy.

In a case of continuing injury the victim can bring successive suits unless it is feasible (as in a personal-injury suit for lost earnings caused by a permanent disability) to quantify the entire future damages and reduce them, through discounting, to a present value that can then be awarded to the plaintiff in a lump sum as his damages. That was not the case here, so Creek was entitled to bring a fresh suit even if the conduct complained of in it was the same conduct complained of in the state court suit. *Id.* at 598, 638 N.E.2d at 244; *Ohio–Sealy Mattress Mfg. Co. v. Kaplan*, 745 F.2d 441, 448–50 (7th Cir.1984); *Restatement, supra*, § 26(1)(e).

There is an alternative basis for not treating the first judgment as res judicata—that

the second (that is, the present) suit challenged unlawful acts committed *after* the first suit, and hence is based on different facts, see *LaSalle National Bank v. County of DuPage*, 856 F.2d 925, 931–33 (7th Cir. 1988), facts, moreover, that could not have been made the basis (or a basis) of the first suit because they did not yet exist. But for this to signify requires that those acts have resulted in injury beyond that caused by the acts complained of in the first suit. Creek cannot obtain damages without proving injury and, the project having been completed, damages are all he is seeking. The district judge thought that Creek could not prove injury, and her conclusion has common-sense appeal if, as the defendants argue, Creek cannot obtain damages for any injury that occurred after July 1, 1980, when he transferred his interest in the development to the first joint venture. The only fresh acts by the defendants between April 14, 1980, and July 1 of that year were the Village's refusal to issue the permit notwithstanding a court order and the Homeowners Association's lawsuit. The Association is no longer a party but the Village as a coconspirator would be liable for the Association's acts committed within the scope of the conspiracy. The Association's lawsuit is claimed to be such an act. Could these acts have precipitated Creek's decision to give up 100 percent ownership of the project? Probably not, but no stronger statement is possible and this one is not strong enough to justify summary judgment for the defendants. On April 14 it must have seemed to Creek that the last obstacles to HUD financing and the commencement of the project had been cleared away. When a month later the Village had not complied with the court order and the Homeowners Association had sued HUD to block the financing, imminent commencement was no longer in the cards. Granted, if negotiations for transferring Creek's interest to a partnership had begun before these untoward events, any inference that the events had caused the transfer would be greatly undermined. But apparently the transfer was a spur of the moment affair, and there is some possibility that the spur was the defendants' continued, pertinacious, last-ditch efforts to thwart Creek.

We have focused on events between April 14, 1980, and July 1, 1980, for Creek must prove that he was injured in consequence of those events in order to counter the defense of res judicata by showing that he was injured by wrongful conduct that occurred after the final judgment in his first suit. But that is only his alternative counter to the defense of res judicata. His main counter, which we also found meritorious, is that the first judgment was not res judicata because damages could not yet be quantified, and this means that he can base his claim for damages on conduct that occurred before as well as after April 14, provided it was before July 1.

■ Creek would be in even better shape if, as he argues, his right to seek damages is not cut off at July 1, 1980. If Pheasant Ridge Venture were a corporation, this argument would of course fail. A shareholder has no right to seek damages for an injury to the corporation, even if he is the sole shareholder. *Carney v. General Motors Corp.*, 23 F.3d 1154, 1157 (7th Cir.1994). But the same thing is true, it turns out, of a partnership. Under the law of Illinois—which determines capacity to sue in this case because the case was brought in a federal district court in Illinois, Fed.R.Civ.P. 17(b)—a partner may not sue individually to recover damages for an injury to the partnership, even though a partnership is a thinner veil between the enterprise and its owners. *Sindelar v. Walker*, 137 Ill. 43, 27 N.E. 59 (1891). This is the general rule, not anything peculiar to Illinois. E.g., *Vinal v. West Virginia Oil & Oil Land Co.*, 110 U.S. 215, 4 S.Ct. 4, 28 L.Ed. 124 (1884); *Crystal Copper Co. v. Gaido*, 5 F.2d 881, 882 (9th Cir.1925). We do not believe that it is affected by the fact that Pheasant Ridge Venture was a limited partnership with only one general partner—who happened to be Creek. The only difference between a limited partnership and an ordinary partnership (that is, a partnership with only general partners) is that the general partner in the limited partnership has unlimited liabilities while the limited partners, as the name implies, have only limited liabilities, that is, liabilities limited to their investment in the partnership. 805

ILCS 210/303(a). We do not see how this difference bears on the right to sue.

■ A partnership did sue here—Pheasant Ridge Venture's successor, PRV/Shell, was a plaintiff in this suit until it settled with the defendants. But *Creek's* right to seek damages terminated on July 1, 1980, though he remains free, as we have said, to show if he can that the loss he incurred when he gave up his 100 percent share in the project on that day was caused by unlawful acts committed by the defendants before the earlier of either July 1, 1980, or the date on which he decided to form the limited partnership and give away 10 percent of the partnership to a limited partner or partners.

But all this is on the assumption that res judicata is the only possible basis for the dismissal of Creek's suit. The defendants argue as is their right that there are alternative grounds, grounds not reached by the district judge but not waived and therefore available to support the judgment if they are good grounds. The only ground that has any possible merit, so the only one we shall discuss, is that the municipal defendants were privileged by the speech and petition clauses of the First Amendment to oppose Creek's development by lobbying state and federal officials and by suing HUD to prevent the provision of rent subsidies. The defendants argue that the fact that the motive for these efforts was racial, as we must assume it was, is irrelevant.

We need not decide whether the lobbying, the "letter-writing campaign," was privileged, because we have already held that Creek's claim for damages ended no later than July 1, 1980, and the campaign did not begin until the following month. That leaves the suit brought by the Homeowners Association. We noted earlier that although the Association is no longer a defendant, the other defendants remain potentially liable for its acts, as its coconspirators.

■ A lawsuit can be a form of constitutionally protected petition for the redress of grievances. E.g., *McDonald v. Smith,* 472 U.S. 479, 484, 105 S.Ct. 2787, 2790–91, 86 L.Ed.2d 384 (1985). And, odd as it may seem, a racial motivation, to the extent that it

lent an ideological hue to the lawsuit, could actually strengthen the case for regarding it as a form of petition for redress of grievances or as an exercise of freedom of speech. Cf. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *National Socialist White People's Party v. Ringers,* 473 F.2d 1010, 1015 (4th Cir.1973) (en banc). Suits that are objectively baseless, that is, frivolous suits, as distinct from colorable suits brought in bad faith, are not constitutionally protected. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 59–61, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993). But there is no indication that the Homeowners Association's suit was frivolous.

■ Nor is it out of the question that a municipality could have First Amendment rights. This question looms as critical because of the contorted procedural posture of the case. If the Homeowners Association's suit was not frivolous, that gets the association off the hook but it is already off the hook because it is no longer a defendant. Immunities, however, are personal. A conspirator does not acquire a coconspirator's immunity. *Dennis v. Sparks,* 449 U.S. 24, 29, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980); *Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982); *Davis v. Bayless,* 70 F.3d 367, 374 (5th Cir. 1995). The Village of Westhaven cannot shelter behind the Homeowners Association's First Amendment immunity; it must establish its own First Amendment immunity, if it can. Otherwise it would be able to achieve indirectly, by fomenting a private litigation, what it could not achieve directly by bringing its own suit to block Creek from building a project that would attract black people to Westhaven.

Only a few cases address the question whether municipalities or other state subdivisions or agencies have any First Amendment rights. All but one, and that not a case against a municipality, answer "no." *Columbia Broadcasting System, Inc. v. Democratic National Comm.,* 412 U.S. 94, 139, 93 S.Ct. 2080, 2104–05, 36 L.Ed.2d 772 (1973) (concurring opinion); *Warner Cable Communications, Inc. v. City of Niceville,* 911 F.2d 634, 638 (11th Cir.1990); *NAACP v. Hunt,* 891

F.2d 1555, 1565 (11th Cir.1990); *Student Government Ass'n v. Board of Trustees,* 868 F.2d 473, 481 (1st Cir.1989); see also *Estiverne v. Louisiana State Bar Ass'n,* 863 F.2d 371, 379 (5th Cir.1989). Contra, *Nadel v. Regents of University of California,* 28 Cal. App.4th 1251, 34 Cal.Rptr.2d 188, 197–98 (1994). The question is an open one in this circuit, and we do not consider the answer completely free from doubt. For many purposes, for example diversity jurisdiction and Fourteenth Amendment liability, municipalities are treated by the law as if they were persons. *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *Moor v. County of Alameda,* 411 U.S. 693, 717–18, 93 S.Ct. 1785, 1799–800, 36 L.Ed.2d 596 (1973). There is at least an argument that the marketplace of ideas would be unduly curtailed if municipalities could not freely express themselves on matters of public concern, including the subsidization of housing and the demographic makeup of the community.

To the extent, moreover, that a municipality is the voice of its residents—is, indeed, a megaphone amplifying voices that might not otherwise be audible—a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment rights of those residents. See Meir Dan-Cohen, "Freedoms of Collective Speech: A Theory of Protected Communications by Organizations, Communities, and the State," 79 *Calif.L.Rev.* 1229, 1261–1263 (1991); cf. *Student Government Ass'n v. Board of Trustees, supra,* 868 F.2d at 482. Thus if federal law imposed a fine on municipalities that passed resolutions condemning abortion, one might suppose that a genuine First Amendment issue would be presented. Against this suggestion can be cited the many cases which hold that municipalities lack standing to invoke the Fourteenth Amendment against actions by the state. E.g., *Coleman v. Miller,* 307 U.S. 433, 441, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939); *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *City of East St. Louis v. Circuit Court for the Twentieth Judicial Circuit,* 986 F.2d 1142, 1144 (7th Cir.1993). But it is one thing to hold that a municipality cannot interpose the Fourteenth Amendment between itself and the state of which it is the creature, *Anderson v. City of Boston,* 376 Mass. 178, 380 N.E.2d 628, 637–38 (1978), appeal dismissed for want of a substantial federal question, 439 U.S. 1060, 99 S.Ct. 822, 59 L.Ed.2d 26 (1979), and another to hold that a municipality has no rights against the federal government or another state. *Township of River Vale v. Town of Orangetown,* 403 F.2d 684, 686 (2d Cir.1968), distinguishes between these two types of case.

▪ Even if municipalities do have First Amendment rights, however, a question we need not decide, we do not think they have the right to foment, whether through speech or otherwise, governmental discrimination on grounds of race. The "or otherwise" is of course the simpler case, as many cases hold that states may not take actions that encourage private racial discrimination. E.g., *Reitman v. Mulkey,* 387 U.S. 369, 378–80, 87 S.Ct. 1627, 1632–34, 18 L.Ed.2d 830 (1967); *Anderson v. Martin,* 375 U.S. 399, 402–04, 84 S.Ct. 454, 455–57, 11 L.Ed.2d 430 (1964); *Sherman v. Community Consolidated School District 21,* 8 F.3d 1160, 1168 (7th Cir.1993); *Griffith v. Bell–Whitley Community Action Agency,* 614 F.2d 1102, 1109 (6th Cir.1980).

▪ At argument we put to the Village's lawyer the following hypothetical case, which is close enough to the facts alleged by Creek to assist our analysis. Illinois sheriffs are independent of county government; and suppose the county executive, acting in his role as the maker of policy for the county government, writes the sheriff of the county urging him not to hire any black deputy sheriffs. The sheriff, though not bound to follow the county executive's advice, is persuaded by it and therefore refuses to hire blacks. Blacks not hired because of this decision sue the county government, alleging racial discrimination in violation of the Fourteenth Amendment. We do not think that the county could interpose the First Amendment as a defense. Speech by government, even when not cast in the form of a command, even when addressed to another organ of government that is not subordinate to it, as in our hypothetical case, cannot be equated for all

purposes to speech by an individual. It remains an official act, and when its purpose and tendency are, as alleged here, to promote discrimination that violates the Fourteenth Amendment, so too does the act. A contrary conclusion would permit government to undermine the duties that the Constitution imposes upon it and would thus be infected by the same vice that has persuaded judges not to allow a municipality to use the Fourteenth Amendment as a shield against the state that has created and under state law controls it. We are mindful that *NAACP v. Hunt, supra,* held that flying the Confederate flag from the Alabama state capitol did not violate the Fourteenth Amendment. But the flag's effect in encouraging the violation of the equal protection clause was tenuous at best, whereas here the Village's litigation and lobbying activity is alleged to have been motivated solely by racial prejudice and to have had as its sole object the exclusion of black people from the Village.

We need not decide how far the principle that the Fourteenth Amendment does not shield the advocacy of racial discrimination by municipalities binds the municipality's officials themselves. We suppose a public official campaigning for reelection has considerable rights of free speech short of incitement, cf. *Joyner v. Whiting,* 477 F.2d 456, 461–62 (4th Cir.1973), though perhaps fewer than a candidate who has no law enforcement responsibilities. Several of the Village of Westhaven's officials have been joined as defendants, but there is no discussion in the briefs (and the issue did not arise at argument either) of their rights under the First Amendment.

To summarize:

1. Creek's suit against the defendants who remain in the suit is not barred by res judicata or by inability to prove injury.

2. The suit against the Village is not barred by the First Amendment, either, and whether the officials of the Village who have also been joined as defendants have a First Amendment defense cannot be determined on the record before us.

3. The suit should not have been dismissed, and the judgment dismissing it must be reversed.

4. But Creek cannot obtain damages (a) for any injury that occurred after July 1, 1980, because the right if any to such damages belongs to other entities, or (b) for any damages resulting from changes in federal law, because those damages were not caused by the defendants' unlawful conduct.

REVERSED AND REMANDED.